Filed 8/6/19

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION THREE

| | |
|---|---|
| BARCLAY HOLLANDER CORPORATION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, LOS ANGELES REGION,<br><br>    Defendant and Respondent;<br><br>SHELL OIL COMPANY,<br><br>    Real Party in Interest and Respondent. | B284182<br><br>(Los Angeles County Super. Ct. No. BS158024) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Affirmed.

---

\*    Pursuant to California Rules of Court, rules 8.1105 and 8.110, this opinion is certified for publication with the exception of parts III and V–VII of the Discussion.

Gibson, Dunn & Crutcher, Patrick W. Dennis, William E. Thomson and Thomas A. Manakides for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Eric M. Katz, John S. Sasaki and Carol Ann Zimmerman Boyd, Deputy Attorneys General, for Defendant and Respondent.

Morgan, Lewis & Bockius, Thomas M. Peterson, David L. Schrader, Deanne L. Miller, Stephanie Chen and Emily L. Calmeyer for Real Party in Interest and Respondent.

————————

Appellant Barclay Hollander Corporation (Barclay) seeks reversal of a judgment of the Los Angeles Superior Court denying its Petition for Writ of Mandate by which it sought to overturn the determination of the State of California Regional Water Quality Control Board, Los Angeles Region (Water Board) that Barclay is jointly and severally responsible with real party in interest Shell Oil Company (Shell) for the cleanup and abatement of petroleum hydrocarbon compounds and other contaminants (the petroleum residue or waste) at the former Shell tank farm in Carson, California (the Site).

We affirm the trial court's order and judgment upholding the Water Board's determination.

### FACTUAL AND PROCEDURAL BACKGROUND

Barclay is a wholly owned subsidiary of Dole Food Company, Inc. In *Dole Food Co., Inc. v. Superior Court* (2015) 242 Cal.App.4th 894 (*Dole*), we considered and resolved issues

2

related to the good faith settlement of a class action brought by owners of homes constructed on the Site, the same area that is the subject of the Water Board's revised Cleanup and Abatement Order (RCAO) in this case.

In our opinion in *Dole,* we described that earlier litigation, in relevant part, as follows. "Between the 1920's and the early 1960's, Shell owned and operated three crude oil storage reservoirs, known as the Kast Tank Farm, at the site which later was developed as the Carousel tract. It is alleged that at least one of the storage tanks was leaking its contents into the soil, causing the site to become contaminated with toxic substances. [¶] In October 1965, Shell entered into an agreement to sell the land to Richard Barclay and his associates (Barclay), a group of residential developers that intended to convert the property into a residential subdivision. Shell transferred title to the property in October 1966. In preparation for the change in use, the oil storage reservoirs were decommissioned, the reservoir walls were torn down and buried on site, and the land was graded for home construction. The land was rezoned from industrial to residential, and the Carousel homes were constructed and sold by the early 1970's.

". . . .

"In 2008, after discovering contamination nearby, the Water Board directed Shell to conduct environmental testing at the Carousel tract. These investigations revealed the presence of petroleum hydrocarbons in the areas where Shell's former oil reservoirs had been located. In March 2011, the Water Board issued a cleanup and abatement order to Shell, directing it to submit a proposed remediation plan. This order was based on Shell's 'ownership of the former Kast Property Tank Farm' and

3

its 'former operation of a petroleum hydrocarbon tank farm at the Site.'

"After submitting an initial RAP[1] that was rejected, Shell submitted a revised RAP in June 2014, with an addendum in October 2014.  Under the revised RAP, Shell will, inter alia, excavate five to 10 feet beneath the homes, following excavation will install a vapor extraction and venting mechanism, and will institute comprehensive long-term monitoring.  In addition, Shell will provide temporary relocation assistance in connection with implementing the RAP, and will compensate Carousel homeowners to ensure they receive fair market value if they elect to sell their homes. [¶] Shell's corporate representative, William Platt, has estimated it will cost Shell $146 million to implement the RAP." (*Dole, supra*, 242 Cal.App.4th at pp. 899-900, fns. omitted.)

We made reference there to the addition of Barclay to the RCAO, writing in footnote 6 of our opinion in *Dole*, ". . . the Water Board recently adopted the staff's recommendation, thus making Barclay Hollander responsible for contributing to the cost of the board-ordered remediation." (*Dole, supra*, 242 Cal.App.4th at p. 900.)  That order is the subject of the present appeal.

Shell purchased the 44.3-acre Site in 1923.  Three storage tanks or reservoirs were situated there; each was constructed with interior concrete liners, its walls supported externally by compacted earth; each reservoir had a wooden top.  The total storage capacity of the three reservoirs was 3.5 million barrels of oil.  Each reservoir was surrounded by an earthen berm 10 to 15 feet in height.  Earthen berms also had been built on the

---

[1]     The acronym RAP stands for remedial action plan. (*Dole, supra,* 242 Cal.App.4th at p. 898.)

4

perimeter of the property to retain any overflow of petroleum. The reservoirs were used primarily to store "heavy oils." Beneath the site are preexisting groundwater aquifers used for drinking water.

During Shell's operation of the Kast Tank Farm the reservoirs leaked,[2] releasing petroleum and petroleum residue into the surrounding soil and groundwater.

By 1959, utilization of the tank farm had decreased; thereafter, the three reservoirs were used for "stand-by storage." As of February 1964, the three reservoirs held a total of 425,448 barrels of a mixture of petroleum product and water.[3]

Barclay made an offer to purchase the Site on October 14, 1965. In a visit to the Site a week later, on October 21, 1965, the Barclay representative learned the condition of the Site, including the contents of the three reservoirs. Four days later, Shell wrote to Barclay pursuant to the latter's request, to advise it more specifically of the contents of each reservoir, enclosing 10 drawings concerning the Site.[4] Later that month, Barclay and Shell agreed to the sale of the Site to "Richard Barclay or

---

[2]     The first leak in the record is one noted in a 1943 status report, which indicates a leak in the lining of Reservoir No. 6, which Shell repaired. Other leaks and the cost of their repair are documented in later Shell memoranda.

[3]     The contents were characterized in contemporaneous Shell internal reports as "unrecoverable" and as "non-usable."

[4]     The letter was addressed to Barclay-Hollander-Curci. The parties do not dispute that the correct party to these proceedings is Barclay, which is the entity surviving after several transfers of ownership of the Site.

nominee" conditioned "upon the effective re-zoning of the industrial property to R-1" and approval by the purchaser "of an engineering report to be obtained at [Barclay's] sole cost and expense." Barclay was also aware of the existence of pipes for transfer of petroleum across and beneath the surface of the Site.

In its letter to Shell dated December 1, 1965, Barclay sought permission "to begin immediately to remove the liquid waste and petroleum residues from the property." Barclay "estimate[d] it will take about three months for completion." In the same letter, Barclay wrote that it would be in a position to begin grading the property and restoring it to its "natural grade" in late February or March of 1966.

Shell consented to these requests for early entry and commencement of the intended work subject to certain conditions, including that Barclay "pay all costs and expenses arising out of your work thereon and the disposition of wastes and residues removed" from the property, and that "all work done by or for [the purchaser] on said lands or in disposing of wastes and residues removed . . . shall be done in a good, lawful and workmanlike manner." Richard Barclay agreed to these terms on behalf of Barclay.

Later that month, on December 28, 1965, Richard Barclay advised Shell that his nominee to take title to the property was Lomita Development Co. (Lomita), doing so by letter on stationery of Barclay.[5] The closing date for the sale was to be July 1, 1966.

In the early months of 1966, Lomita obtained from Pacific Soils Engineering, Inc. (PSE) several reports on the condition of

---

[5] Barclay does not dispute that it is responsible for the actions of Lomita at the Site.

the soil on the Site and recommendations on how to dispose of the four-foot-thick concrete structures that had been used in the construction of the three reservoirs.  In the section of its January 7, 1966 letter to Lomita headed "Present Site Conditions," PSE described the reservoirs and surrounding area as follows:  "The existing structures on the subject tract were constructed prior to 1930 and consist of three large oil reservoirs and their attendant berms.  The earthen walls of the reservoir[s] are generally about fifteen feet in height and have a slope ratio of 1-1/2:1.  The bottom[s] and sides of the reservoir[s] are lined with a four-inch blanket of reinforced concrete.  The reservoirs are nearly 30 feet deep and are covered by wooden roofs. . . . [¶] Earthen berms ranging in height from ten to fifteen feet have been constructed between the reservoirs and around the exterior boundaries of the tract. [¶] Due to the permeability of the surface soils, water tends to pond in the topographically low areas of the tract.  An old sump, reported to be only three feet in depth, has been approximately located . . . .  In addition, large underground pipes and conduits are to be found throughout the tract."

PSE recommended that the concrete either be "wasted from the site or buried deep enough in the fill so as not to interfere with further construction."  Confirmation that the concrete slabs were buried on the Site appears (a) in the terms and conditions for issuance of the subdivision map for the development approved by the Regional Planning Commission of the County of Los Angeles; those terms included breaking up the concrete and burying the slabs at least seven feet beneath the finished grade; and (b) in a letter from PSE to Lomita, dated January 27, 1966, in which PSE described the method by which it would break up

7

and place the concrete slabs at the appropriate depths before covering them.[6]

In March 1966, PSE reported to Lomita with respect to its testing of the soils at one of the reservoir sites that "the soil[s] beneath the reservoir conform to those found in our original exploration: Generally, the first three feet found directly beneath the [concrete] slab tend to be silty and clayey sands which are highly oil stained. The underlying soils are fine to medium clean sands. All soils are in a dense state and suitable to receive fill. Most of the soils in the borings have a petroleum odor, however the actual amount of oil contained in the soil is unknown." This report was accompanied by an exhibit, denominated "Plate B," dated March 11, 1966, which listed the results of six borings and the condition of the soil in each boring at various depths, reporting that oil and oily smell were present in almost every boring and at almost every depth.

Notwithstanding the December 1, 1965 letter agreement in which Barclay had set out its schedule for cleanup and grading of the Site, an April 1966 internal Shell memorandum indicated that as of that date, Lomita had not completed any phase of its work, explaining that while two of the reservoirs were "empty and clean," oil and water remained in the third. According to this memorandum, the property was not in "a safe condition in [its] present state" with respect to two of the three reservoirs. An August 15, 1966 internal Shell memorandum indicated that by that date all of the "oil" had been removed and the safety hazards had been remediated. This memorandum noted, "This leaves the

---

[6] The January 27, 1966 letter from PSE to Lomita also states that "Prior to placing fill on the broken bottom slab[s], hand auger holes will be drilled to examine existing underlying soils."

8

property so there is almost nothing to burn and no chance of anyone falling in any kind of oil sump or pit."

In September 1966, PSE reported to Lomita on a revision in the method that would be used to bury the concrete slabs, advising that once the slabs were broken up, they should be "thoroughly mixed with soil, watered and compacted with a heavy vibratory roller. Following completion the mixture should be watered thoroughly to insure proper filling of all voids." PSE reported it had tested this method and that "Applying this to [the] entire reservoir bottom, nearly 5,000,000 cu. ft. of water should percolate through the reservoir floor. This indicates that drainage should not be a problem in the development of this parcel." In April 1967, PSE made a similar recommendation for another section of the Site.

The transaction had originally been scheduled to close escrow in July 1966; however, various delays resulted in extending the closing date to October 1, 1966. The Grant Deed from Shell to "Lomita Development Co., a partnership" was recorded in the Office of the Los Angeles County Recorder on October 14, 1966.

Thereafter, Lomita sold a few lots in the new subdivision to homeowners before granting the remainder of the Site to "Barclay Hollander Curci, Inc, a California corporation." The remainder of the lots were sold by the successor entity, Barclay Hollander, Inc. (BHI).[7]

---

[7]     Although Barclay's opening brief indicates the final sales were made in 1971, the citation to the record on this point refers to a 1960 tract map and therefore does not substantiate that date. The date has relevance to determining the law applicable to Barclay's claim that it is entitled to rely on the safe harbor of

In March 2008, the Water Board learned from the California Department of Toxic Substances Control that the soil and groundwater at the Site may be contaminated from discharges of petroleum hydrocarbons. Stating its "concern[] with the potential threat to the health of residents from the exposure to petroleum related contaminants," on May 8, 2008, the Water Board ordered Shell, as a former owner and operator of the Site, "to initiate a complete environmental investigation including evaluation of impacts to groundwater and the potential threat to human health and if immediate action is required."[8]

---

Water Code section 13304, subdivision (j). We address this issue in part VII of this opinion.

[8] The Water Board cited Water Code sections 13304 and 13267 as authority for this order. Water Code section 13304 provides, in pertinent part:

"(a) A person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the effects of the waste . . . .
 ". . . .
"(j) This section does not impose any new liability for acts occurring before January 1, 1981, if the acts were not in violation of existing laws or regulations at the time they occurred."
Water Code section 13267 provides, in pertinent part:
"(a) A regional board, in establishing or reviewing any water quality control plan or waste discharge requirements, or in

In response to that order, Shell conducted the requested environmental investigation, including collecting analytical data, and compiled technical reports based on 2,400 samples taken at several locations on the Site.  The data revealed petroleum hydrocarbon contamination at varying depths at these locations and, inferentially, throughout the Site.

In a June 9, 2010 letter from Shell to the then Interim Executive Officer of the Water Board, Sam Unger (Unger), Shell

---

connection with any action relating to any plan or requirement authorized by this division, may investigate the quality of any waters of the state within its region.

(b) (1)  In conducting an investigation specified in subdivision (a), the regional board may require that any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste within its region, or any citizen or domiciliary, or political agency or entity of this state who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge, waste outside of its region that could affect the quality of waters within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires.  The burden, including costs, of these reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained from the reports.  In requiring those reports, the regional board shall provide the person with a written explanation with regard to the need for the reports, and shall identify the evidence that supports requiring that person to provide the reports.

"  . . . .

"(e)  As used in this section, 'evidence' means any relevant evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in a civil action."

11

provided its understanding of the organizational history of Barclay and related entities, including that Barclay was now a wholly owned subsidiary of Dole. Also in that letter, Shell "acknowledge[d] its obligation to address the environmental conditions created by its former operations." Shell "respectfully requests that you also include Barclay Hollander and Dole Foods on any order issued related to remediation of the [Site]." The next month, Shell's attorneys sent the Water Board a 14-page letter accompanied by 35 exhibits in which they documented the bases for Shell's request that Barclay and Dole be added to the Cleanup and Abatement Order (CAO).

On March 11, 2011, the Water Board issued a CAO (No. R4-2011-0046) to Shell, ordering it to clean up and abate the contamination at the Site. The CAO contained the determination that Shell was a discharger as described in Water Code section 13304 and a responsible party for the Site based on its prior ownership of the Site and its former operation there of the petroleum hydrocarbon tank farm. The Water Board's findings included that Shell's "activities at the Site have caused or permitted the discharge of waste resulting in soil, soil vapor, and groundwater pollution, including discharges of waste to the waters of the state, and nuisance."

The CAO ordered Shell to assess, monitor, clean up and abate the effects of the petroleum hydrocarbon compounds and other contaminants at the Site.

The next month, on April 22, 2011, the Water Board notified Barclay's parent, Dole, that information in the files of the Water Board, including information provided by Shell, "suggests that the contamination related to the shallow soil [from 0 to 10 feet below ground surface . . . and perhaps deeper] was directly

12

related to the demolition of the petroleum hydrocarbons (crude oil) storage reservoirs and the grading of the [Site], which were performed by, and were the sole responsibility of, [Lomita] and its affiliate(s)." The Water Board ordered Dole to provide all information related to its ownership of the Site and activities there, specifically requesting information regarding the reservoirs and redevelopment of the Site into the Carousel tract neighborhood, and to do so by June 15, 2011.[9]

On September 15, 2011, following an extension of time granted by the Water Board, Dole's attorneys responded to the April 22, 2011 order in a 25-page letter, accompanied by 113 exhibits and a declaration. Dole took the position that there was no legal basis upon which to name it as a discharger based on any activities of Lomita, and because, "In April 1969, a Dole subsidiary, not Dole, acquired the remaining unsold lots. . . . In any event, whether or not the Dole subsidiary is a discharger, Dole does not become a discharger on the mere basis that it owns a corporation that is an alleged discharger."

On October 31, 2013, Water Board Site Cleanup Program Staff (SCP Staff) proposed adding Barclay as an additional responsible party. Also, on that date, the Water Board issued a draft revised CAO (RCAO) adding Barclay as a responsible party, and offered Dole and Shell, and the public, the opportunity to submit comments and evidence with respect to it. Dole requested an extension of the scheduled response date, advising that "we have experts who will be offering written opinions regarding certain issues presented," also asking for time to respond to comments that may be made to the draft RCAO by others. The

---

[9] This order was issued pursuant to Water Code section 13267.

Water Board granted Dole's request and a subsequent request for an additional extension of time.  Dole's response to the draft RCAO, which it filed on January 21, 2014, consisted of an 82-page brief, a 333-page technical response, expert witness declarations and 359 exhibits; in all, it totaled over 11,000 pages.[10]

On June 3, 2014, the Water Board gave notice it would accept additional public comments on the proposed RCAO.[11]

Shell filed its comments addressing Dole's January 2014 submission on June 16, 2014, to which Dole responded on June 30, 2014, with a letter, a witness declaration and additional expert witness declarations, totaling 800 pages.

On December 8, 2014, Unger, now the Executive Officer of the Water Board, issued a memorandum advising that the Water Board was recommending issuance of the RCAO by adding Barclay as a responsible party and discharger.  The memorandum contained an extensive discussion of the bases for this recommended determination; it was accompanied by 15 attachments, including SCP Staff's analysis of the issues raised in Dole's letters to the Water Board.

---

[10]    In this filing, Dole acknowledged that Barclay carried liability insurance and that "in that limited sense," it has assets. Dole continued to contest that Barclay was a discharger and responsible party, but conceded that if an RCAO were to issue, Barclay was the appropriate party to be named in it.

[11]    The parties have not cited, and we did not locate in the record, any comments that may have been received from the public.

14

Dole responded to this memorandum on December 24, 2014, for the first time asking the Water Board executive in charge of the matter (Chief Deputy Executive Officer Smith, or Smith) to conduct a formal hearing and to give consideration to what Dole described as "additional critical evidence" that Barclay characterized as previously unavailable.

On January 6, 2015, Dole filed a 19-page letter by which it submitted multiple additional expert reports as well as other materials it sought to have the Water Board consider before issuing a revised order adding Barclay as a discharger and responsible party. The next day, counsel for Shell submitted a letter in response to Dole's December 24, 2014 letter in which Shell argued there was substantial evidence to add Dole and Barclay as responsible parties. Shell also observed that Dole was in error in claiming in its December 2014 letter that it had not been told earlier that the Water Board was considering naming Barclay in the RCAO, and questioned why counsel for Dole and Barclay were only then making a request for a formal hearing.

On January 9, 2015, the Water Board issued a notice to "All Parties and Interested Persons" advising that it was considering the requests and offering the opportunity to comment on the December and January submissions by Dole and Shell, setting the deadline for receipt of such comments at January 16, 2015.

On January 15, 2015, SCP Staff advised that it had no opinion on whether a formal, oral hearing should be held; also writing that the request for such a hearing "is surprising given that Barclay has known since at least October 31, 2013, that SCP Staff was considering adding Barclay and other parties to the CAO." SCP Staff stated its objection to the request to submit additional evidence because "Barclay has had many opportunities

15

to do so and was provided extensions of time to allow an adequate opportunity to respond." SCP Staff also stated its disagreement with the factual claims in other recent submissions by Dole.

In its January 16, 2015 filing, Dole argued its additional evidence should be admitted, now citing the "California Administrative Procedure Act ('APA') provisions, and State Water Resources Control Board ('State Board') regulations" as the bases for its request for an oral hearing.[12]

On February 27, 2015, the Water Board resolved Barclay's requests to submit additional evidence, ruling that it would not add to the record evidence that was previously available and which could have been submitted during the prior notice and comment periods; it would, however, accept the transcript of deposition testimony of George Bach (Bach), the engineer who had supervised Lomita's work on the Site.

The Water Board also denied Barclay's request to schedule a formal evidentiary hearing, ruling that multiple opportunities had been offered for anyone interested to submit written testimony and evidence and that Dole and Barclay had "utilized these opportunities and submitted more than 1,000 [*sic*, 11,000] pages of documentary evidence. The factual questions raised by the Draft [RCAO] are primarily technical and therefore, fit to be addressed through written expert reports and rebuttal." After stating additional reasons why the recently made request for formal hearing was inappropriate, the Water Board concluded, "In light of the particular factual, legal and policy questions that are raised, the Board has determined that the issues are

---

[12] This set of documents is the subject of the first of Barclay's two requests for judicial notice filed in this court. We address both of Barclay's requests for judicial notice in section III, below.

16

adequately and thoroughly addressed through the submitted written evidence and testimony, that [Dole and Barclay have] been provided the opportunity for fair consideration of [their] claims, and the burden and cost of an oral hearing is not warranted in this instance." The parties were nevertheless offered the opportunity to comment on the Bach deposition transcript which the Water Board had agreed to admit.[13]

On April 2, 2015, counsel for Dole and Barclay provided written comments on the Bach deposition, also urging that an earlier unsworn statement Bach had made be disregarded. Also on that date, counsel for Shell submitted a letter in which it argued that the Bach deposition merely confirmed information already stated by him. SCP Staff wrote on the same day that, in its view, the Bach deposition did not alter Staff's conclusion that Barclay should be added to the CAO as a responsible party.

On April 17, 2015, the Water Board issued notice that action on the draft RCAO could be expected on or shortly after April 24, 2015. Counsel for Dole and Barclay wrote to Smith on April 22, acknowledging receipt of the April 17 notice and asking that the Water Board defer any ruling until after certain depositions had been taken in the *Acosta* civil action.[14] On April 30, 2015, the Water Board explained why it considered it

---

[13]    These rulings were made by Smith, the Chief Deputy Executive Officer who had been designated by the Water Board's Executive Officer to act with respect to the RCAO.

[14]    The reference is to *Acosta v. Shell Oil Co.* (Super. Ct. L.A. County, No. NC053643), one of the actions which was addressed in our opinion in *Dole, supra,* 242 Cal.App.4th 894. See above, at pages 2 and 3.

17

inappropriate to further defer completing action on the proposed addition of a responsible party to the CAO, also advising counsel for Dole and Barclay, and counsel for Shell, that the Water Board was that day issuing the RCAO adding Barclay as a discharger and as a responsible party with respect to the Site. This letter stated in part:

"The modifications to the Draft Revised CAO include a finding by the Regional Board that [Barclay's] activities at the Site not only violated Health and Safety Code section 5411, but also violated Fish and Game Code section 5650 and Los Angeles County Code section 20.36.010.1. . . . Barclay's activities in breaking up concrete reservoirs, ripping the reservoir floors, and moving soil at the Site permitted petroleum and related products to pass into, or [be] placed where it could pass into, waters of the State. The activities also discharged and deposited, and allowed the continued existence of a deposit of, petroleum hydrocarbons that created a public nuisance, a menace to the public health and safety, pollution of underground waters, and damage to private property."

The letter gave notice that anyone aggrieved by the Water Board's action could petition the State Water Resources Control Board (State Board) to review the action within 30 days.

Among the findings of the 41-page RCAO were the following:

"11. Pollution of Waters of the State: The Discharger has caused or permitted waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance. As described in this Order and the record of the Regional Board, the Discharger owned and/or operated the site in

18

a manner that resulted in the discharges of waste. The constituents found at the site as described in Finding 8 constitute 'waste' as defined in Water Code section 13050(d). The discharge of waste has resulted in pollution, as defined in Water Code section 13050(*l*). The concentration of waste constituents in soil and groundwater exceed water quality objectives contained in the Water Quality Control Plan for the Los Angeles Region (Basin Plan), including state-promulgated maximum contaminant levels. The presence of waste at the Site constitutes a 'nuisance' as defined in Water Code section 13050(m). The waste is present at concentrations and locations that *'is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . and [a]ffects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.'*

"....

"13. Substantial evidence indicates that the Discharger caused or permitted waste to be discharged into waters of [the] state and is therefore appropriately named as a responsible party in this Order. Shell owned and operated the Site, then sold the property to the developers, leaving in place three reservoirs and residual petroleum hydrocarbons in at least one tank and in soil underneath and surrounding the reservoirs. The residual petroleum hydrocarbons are still present at the Site and continue to cause pollution and nuisance as documented in this Order and the Regional Board files. The Regional Board has investigated additional potentially responsible parties (including, but not limited to, Lomita Development Company, Richard Barclay,

19

Barclay-Hollander-Curci, Dole Foods, Inc., Barclay Hollander Corporation and/or any of its successors) and has determined that Lomita, which merged into and was survived by Barclay-Hollander-Curci, renamed [Barclay], caused or permitted the discharge of waste at the Site.  Lomita purchased the Site with explicit knowledge of the presence of the petroleum reservoirs and the presence of residual petroleum hydrocarbons, and conducted various activities, including partially dismantling the concrete in the reservoirs and grading the onsite materials.  These activities spread the waste at the Site and contributed to the migration of the waste through soil and groundwater.  The residual petroleum hydrocarbons are still present at the Site and continue to cause pollution and nuisance as documented in this Order and the Regional Board files.  Including [Barclay] as a responsible party in this Order is consistent with orders of the State Water Resources Control Board construing Water Code section 13304 naming former owners who had knowledge of the activities that resulted in the discharge and the legal ability to control the continuing discharge.  Including [Barclay] as a responsible party is consistent with Water Code section 13304(j) because Lomita or [Barclay's] actions that resulted in creating pollution and nuisance were unlawful since at least 1949.  If the Regional Board becomes aware of any other responsible parties it will consider naming such persons in this Order."[15]  (Original italics, fns. omitted.)

_____

[15]    Water Code section 13304, subdivision (j) provides a safe harbor from sanction under the Porter-Cologne Water Quality Control Act if the conduct otherwise subject to that law occurred prior to 1981 and complied with "existing laws or regulations at the time [the conduct] occurred."

20

On May 21, 2015, counsel for Dole and Barclay notified Smith they intended to challenge the RCAO and asked that its implementation be stayed. The Water Board denied this request. Barclay's appeal to the State Board was denied by operation of law after that body took no action on it. (Wat. Code, § 13320, subd. (a); Cal. Code Regs., tit. 23, § 2052, subd. (a)(1); see *Johnson v. State Water Resources Control Bd.* (2004) 123 Cal.App.4th 1107, 1112-1113; *People ex rel. Cal. Regional Wat. Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, 177.)

Barclay filed its "Verified Petition for Review of Administrative Mandamus (Code Civ. Proc., § 1094.5)" on September 30, 2015, which was superseded on March 1, 2016, by the operative "Verified First Amended Petition for Writ of Administrative Mandamus." Following trial on April 24, 2017, the superior court denied the petition. Judgment on the petition was entered on June 5, 2017. This timely appeal followed.

## CONTENTIONS

Barclay contends: (1) the Water Board failed to hold the type of hearing required by the Administrative Procedure Act (Gov. Code, §§ 11340-11529) (APA**)** and its Administrative Bill of Rights (Gov. Code, §§ 11425.10-11425.60 (Bill of Rights); (2) the payments Shell made to the Water Board constituted a conflict of interest tainting the proceedings and the RCAO; (3) Barclay's actions are protected by the safe harbor of Water Code section

---

The Water Board explained in a footnote to paragraph 13 of the RCAO that Barclay's conduct did not qualify for this safe harbor based on the Water Board findings that Barclay's actions were contrary to Health and Safety Code section 5411, Fish and Game Code section 5650 and Los Angeles County Code section 20.36.010.

13304, subdivision (j); (4) Barclay did not cause or permit a discharge of waste because its actions were not performed with the required knowledge of the hazards created; and (5) the trial court erred in refusing to admit and consider additional evidence proffered by Barclay.[16]

## DISCUSSION

### I.    *Introduction*

The Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) (the Porter-Cologne Act), under which the RCAO was issued, revised Water Code provisions addressing both water rights and water quality and expanded the statewide program of water quality control maintained through regional administration within the framework of statewide coordination and policy.  For the purposes of the Porter-Cologne Act and of its predecessor, the Dickey Water Pollution Act (former Wat. Code, § 13000 et seq.) (the Dickey Act), the state is divided into nine regions, each of which is governed by a regional board.  (Wat. Code, §§ 13200, 13201; compare Dickey Act, former Wat. Code, §§ 13040-13044.)[17]  Each regional board is charged with formulating and adopting water quality control plans for its

---

[16]    Barclay does not also argue, based on one or more of these claims, that the Water Board failed to proceed in the manner required by law and that Code of Civil Procedure section 1094.5, under which this case was filed in the trial court, requires that the judgment be reversed.  Nevertheless, we understand that to be the import of the first of Barclay's contentions.

[17]    Future references to the Porter-Cologne Act will be made to the relevant Water Code section number; references to provisions of the Dickey Act will be made to the relevant "former" Water Code section number.

22

region and, through those plans, establishing water quality objectives that will "ensure the reasonable protection of beneficial uses [of waters of the state] and the prevention of nuisance." (Wat. Code, §§ 13240, 13241.)

Pursuant to the Porter-Cologne Act, a regional board may issue orders to enforce its water quality control plans and, as relevant here, may issue orders mandating the cleanup and abatement of waste by any person "who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state." (Wat. Code, §13304, subd. (a).)[18]

In this case, the Water Board issued a cleanup and abatement order, originally ordering only Shell to clean up and abate the petroleum residue and waste at the Site. On this appeal, Barclay advances several reasons why, in its view, the Water Board erred in adding it as a responsible party to the RCAO and why the superior court erred in sustaining that order.

---

[18] At the time of Barclay's actions in the present case (principally, through its agent Lomita), the predecessor legislation addressing, inter alia, water quality, the Dickey Act, was in effect. While the administrative structure of the statewide water control program was similar, and the remedies available and at issue in this case are those provided for under the Porter-Cologne Act, many of the statutory provisions relevant to the issues in this appeal require consideration of provisions of the Dickey Act rather than those of the Porter-Cologne Act, as we discuss in the text, below.

23

## II. *Standards of Review*

"A party aggrieved by a final decision or order of a regional board . . . may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate." (Wat. Code, § 13330, subd. (b).) The petition for writ of mandate is governed by Code of Civil Procedure section 1094.5, subdivision (c), and "the court shall exercise its independent judgment on the evidence." (Wat. Code, § 13330, subd. (e).) " 'In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' " (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 879.) An "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)

"The independent judgment standard in which the trial court determines whether administrative findings are supported by the weight of the evidence differs from the substantial evidence standard of review. (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 435 (*Alberda*).) 'In substantial evidence review, the reviewing court defers to the factual findings made below. It does not weigh the evidence presented by both parties to determine whose position is favored by a preponderance. Instead, it determines whether the evidence the prevailing party presented was substantial—or, as it is often put, whether any

rational finder of fact could have made the finding that was made below.  If so, the decision must stand.' (*Ibid.,* italics omitted.)  In contrast, under the independent judgment standard, 'the trial court begins its review with a presumption that the administrative findings are correct, it does not defer to the fact finder below and accept its findings whenever substantial evidence supports them.  Instead, it must weigh all the evidence for itself and make its own decision about which party's position is supported by a preponderance.  [Citation.]  The question is not whether any rational fact finder could make the finding below, but whether the reviewing court believed the finding actually was correct." (*Ibid.*, italics omitted.)" (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 187-188; see *Marina County Water Dist. v. State Water Resources Control Bd.* (1984) 163 Cal.App.3d 132, 138.)

"Where, 'as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test. [Citations.]' (*Fukuda* [*v. City of Angels* (1999)] 20 Cal.4th [805,] 824.)  '[W]e review its factual determinations under the substantial evidence standard and its legal determinations under the de novo standard.  [Citations.]  "[W]e are not bound by the legal determinations made by the state or regional agencies or by the trial court.  [Citation.]  But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." [Citation.]' (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* [*, supra,*] 12 Cal.App.5th [at p.] 190.)"

(*Monterey Coastkeeper v. State Water Resources Control Bd.* (2018) 28 Cal.App.5th 342, 361; accord, *Alberda, supra*, 214 Cal.App.4th at p. 434; *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1442 [appellate review of questions of law is de novo].)

### III. *The parties' requests for judicial notice; Barclay's claim that the trial court wrongly rejected evidentiary materials it proffered*

We first address requests for judicial notice on appeal of documents as requested by the Water Board and by Barclay, next considering Barclay's claim that the trial court wrongly rejected its proffer of certain evidence. We do so because whether these materials are properly considered has direct impact on our consideration of other contentions Barclay raises on appeal.

We earlier granted the Water Board's request that we take judicial notice of the legislative history of Statutes 1969, chapter 482, section 18; of Statutes 1970, chapter 918, section 5.3; of Statutes 1971, chapter 1288, section 11; and of Statutes 1980, chapter 808, section 3.[19] In addition to there being no opposition stated to these requests, we did so because, as the Water Board noted in its request, one of the issues presented by Barclay in this appeal is the proper interpretation of certain statutes, particularly Water Code section 13304, subdivision (j). Legislative history materials are commonly the subject of judicial notice and are of assistance in resolving such issues. (See Evid. Code, § 452, subd. (c) [reports of legislative committees]; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19; *Kaufman & Broad*

---

[19] These statutes contain the original text of the Porter-Cologne Act and of certain amendments to it.

*Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [explicating types of legislative materials of which judicial notice may be taken].)

The Water Board also requested that we take judicial notice of three letters it sent to Shell that concern Shell's participation in the Site Cleanup Oversight Reimbursement Account (Cost Recovery Program) dated May 8 and December 2, 2008 and July 15, 2011. It does so in connection with its response to Barclay's argument in section VI, below, that proceedings before the Water Board relating to the determination to add Barclay as a responsible party were "tainted" by payments Shell made to the Water Board. We grant this request for reasons we discuss in our rulings regarding these letters in that section of this opinion.

Barclay made two unopposed requests for judicial notice, both of which we granted prior to argument. The second request, filed November 9, 2018, by which Barclay seeks judicial notice of sections 640 and 648 through 648.8 of title 23 of the California Code of Regulations, is clearly authorized by Evidence Code sections 452, subdivision (c), and 459 as these regulations are relevant to issues raised in this appeal. We modify our prior grant of this request for reasons we explain in the accompanying footnote.[20]

---

[20] The text of these regulations as Barclay presented it in the subject request for judicial notice was not adopted. Inspection of the History Table for Chapter 1 of Division 3 of the regulations of the State Water Resources Control Board and Regional Water Control Boards reveals that this document, Resolution 98-120 of the State Water Resources Control Board, containing versions of the regulations of which Barclay sought judicial notice, was

Barclay's first request, filed March 20, 2018, presents more nuanced issues, issues requiring detailed discussion to explain the reasons for our initial order and the reasons we revisit that order now.

We begin our review of this request by describing by category the documents contained in it, further identifying in parentheses following each category the numbers which Barclay assigned to them in its request: (a) pleadings and memoranda filed in other litigation (1-9); (b) memoranda of the Chief Counsel of the State Water Resources Control Board (10-11); (c) pleadings and declarations filed by Barclay concerning its petition for review of the RCAO (12-16); (d) transcripts of depositions of Dr. Ayalew (a Water Board employee) and of Unger (17-18); records of the State and Regional Water Boards (19-23); (e) invoices issued by the Regional Water Board to Shell between 2008 and 2015 (24); (f) the transcript of the June 12, 2014 meeting of the Water Board (25); (g) "hearing procedure" and other documents prepared by other regional water boards (26-36); (h) an organizational chart of "the Board" (37); and (i) events which

rejected by the Office of Administrative Law (OAL) on January 12, 1999. Thereafter, a revised set of those regulations was approved by the OAL. We therefore modify our prior grant of judicial notice, taking judicial notice of the approved versions of title 23 of the California Code of Regulations sections 640 and 648 through 648.9, pursuant to Evidence Code sections 452, subdivisions (b) and (c) and 459.

We also take judicial notice of the legislative history of the statutes discussed at various locations in the course of this opinion based on the statutory provisions and case authority we have cited.

Barclay describes as "facts and propositions not reasonably subject to dispute." (38-43).

Barclay represents that, in the judgment before us on this appeal, the trial court took the following actions on the items listed: (a) it declined to take judicial notice of items 1-11, 17-35, 37, and 39-42; and (b) it took judicial notice of items 12-16, and 38. Barclay does not indicate in its request for judicial notice any action by the trial court with respect to items 36 and 43.[21]

Because the trial court did take judicial notice of certain of the items listed, they are already part of the administrative record in this appeal and their inclusion in the subject request was unnecessary.

With respect to the items as to which the trial court denied Barclay's request for judicial notice which Barclay now renews, we granted Barclay's request earlier in these proceedings so that we would have those items before us for the purpose of determining, once we received the parties' briefs, if there were some basis upon which they are appropriate for consideration on this appeal.

The principal argument Barclay makes in support of its current request is that the judgment should be reversed based on the trial court's refusal to grant Barclay's request to admit these items. A corollary argument which Barclay advances in this

---

[21]    Barclay responded to a question which we posed in our June 10, 2019 letter (Gov. Code, § 68081) concerning its request that the trial court take judicial notice of these items by advising us that the trial court denied that request. We also deny the similar request which Barclay makes on appeal on the same basis as we state in the text of this opinion regarding Barclay's request as to other documents which were also denied admission into the trial court record.

court is that these items aid in establishing "procedural [un]fairness" of the proceedings before the agency.

Now that we know its full context, we reconsider Barclay's first request for judicial notice as to the items not already part of the record, doing so to determine whether the trial court abused its discretion in denying the request that it take judicial notice of the items still at issue (all items other than 12-16). We apply this standard to our review because it is established that an appellate court reviews for abuse of discretion an appellant's claim that a trial court wrongly denied its requests for judicial notice (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264, revd. on other grounds in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919) and because there is no basis upon which to take judicial notice on appeal of items not in the administrative record (subject to an exception which we address below).

To be considered in quasi-judicial administrative mandamus proceedings, such as the present one, Code of Civil Procedure section 1094.5, subdivision (e) requires that the material must have been unavailable at the time of the hearing "in the exercise of reasonable diligence" or otherwise improperly excluded from the record. (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 367, citing *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 578.) Further, a trial court's order granting judicial notice is presumed to be correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Yu v. University of LaVerne* (2011) 196 Cal.App.4th 779, 787.)

In arguing the trial court wrongly denied its request to take judicial notice of the documents it now seeks to have us add to

the record on appeal, Barclay restates the arguments it made below and which were denied twice in the trial court.  At the time Barclay's request was first denied, the reasons included that Barclay did not "convince the court that what it wants to be added to the record is relevant and could not, with reasonable diligence, have been presented during the period of time the [RCAO] was being considered by the Board Officer up to 4/30/15 [the date the RCAO was issued]. [¶] As to material that did not exist at the time of the [RCAO], the evidence shows that [Barclay], with the exercise of reasonable diligence, could have developed it earlier. . . . [¶] [Barclay] fails to show sufficient evidence of reasonable diligence for not presenting much of the exhibits . . . .  It appears that as to these exhibits that were not produced earlier that [Barclay's] approach was to simply let things ride during the 2-1/2 year period [in which the Water Board was considering issuing the RCAO] . . . . [¶] In addition, the court finds that the 'cost recovery' procedures and application do not amount to any bias by any standard."

When Barclay later sought to have the court which adjudicated its mandate petition take judicial notice of the documents, it presented no more cogent argument:  the result was that the trial court additionally took judicial notice only of a corrected deposition transcript (item 38) and of Barclay's petition to the State Board (item 12), and denied the other requests.  In doing so, the trial court rejected Barclay's claims of relevance and of diligence in obtaining and presenting the items, determining a second time that "Barclay failed to exercise reasonable diligence in developing and presenting the exhibits to the Regional Board."

Barclay presents no different or more compelling argument to this court and makes no cogent argument as to how the trial

31

court abused its discretion in denying Barclay's earlier similar requests. Before reaching this determination we also reviewed the February 27, 2017 document containing the Water Board's denial of Barclay's requests to augment the record with many of the documents which are also in its request to this court. Having done so, we find the reasons stated in the superior court's two rejections of Barclay's requests and those stated by the Water Board, at least equally as cogent at this stage of the case.[22] We determine that there was no error below in the denials; accordingly, we deny Barclay's first request for judicial notice.

Barclay's related argument, that the trial court should have considered the materials contained in its first request for judicial notice filed in this court (which are not already part of the record on appeal) because they bear on procedural unfairness—and that the judgment should be reversed for this reason, is also fatally

---

[22] In its opposition to this request for judicial notice, the Water Board points out that many of the "facts" which Barclay seeks to have admitted on appeal had been excluded below as being both cumulative and presented untimely, and that Barclay had not—and has not—convincingly established that it diligently sought to obtain the material it belatedly requested to add to the record below (e.g., the public records material); nor has it established the relevance of that material. Shell makes similar arguments. Both sets of argument have merit.

We also observe that many of the documents (e.g., pleadings in other actions and deposition transcripts in those actions) would be admissible under any circumstances only for the fact of their existence and not for the truth of the matters they contain; nor are they relevant to issues presented on this appeal. (See *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075.)

flawed.  The additional materials Barclay has proffered do not address procedural unfairness in the action we now review.  Also, the principal case upon which Barclay relies, *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, concerns both the impact of "pecuniary interests of board members" and their personal embroilment in the dispute before that agency.  (*Ibid.*, p. 1170, fn. 17 & p. 1173.)  There is no such evidence in the present case, whether in the record or in Barclay's request for judicial notice.[23]

For these reasons, none of the materials in Barclay's first request for judicial notice in this court (other than those already in the record on appeal) are admitted for any purpose other than to adjudicate Barclay's request.

## IV. *Compliance with the Administrative Procedure Act and its Bill of Rights*

### A. The APA's provisions do not automatically apply to state agencies, including the Water Board

The APA (Gov. Code, §§ 11340-11529) provides that adjudicative proceedings,[24] and orders made therein by administrative agencies, must comply with hearing procedures

---

[23]     There is one exception to our conclusion in this regard, i.e., Barclay's claim that Shell "paid for" the investigation of Barclay resulting in it being added to the order.  We resolve that claim, adversely to Barclay, in section VI of this opinion.

[24]     An adjudicative proceeding is "an evidentiary hearing for determination of facts pursuant to which an agency formulates and issues a decision."  (Gov. Code, § 11405.20.)  A "decision" is "an agency action of specific application that determines a legal right, duty, privilege, immunity, or other legal interest of a particular person."  (Gov. Code, § 11405.50.)

set out in the APA, *when the APA is made applicable to those proceedings*.

Since 1995, the APA has included a Bill of Rights (Gov. Code, §§ 11425.10-11425.60) which "specifies the minimum due process . . . requirements that must be satisfied" in adjudicative proceedings conducted by state agencies. (Cal. Law Revision Com. com., Deering's Ann. Gov. Code (2010 ed.) foll. § 11425.10, p. 133.) These due process requirements can be satisfied, depending on certain factors, by compliance with either "formal" or "informal" hearing procedures. (Gov. Code, § 11500 et seq. [formal proceedings] and § 11445.10 et seq. [informal proceedings], respectively.)

Barclay contends the procedures utilized by the Water Board in determining it was a discharger and in adding it as a responsible party in the RCAO violated the Bill of Rights. It bases its argument on the declarative statement in its opening brief that "Under California's Administrative Procedure Act, every adjudicative proceeding conducted by a state agency— including proceedings considering the issuance of cleanup orders—must follow either formal or informal hearing procedures." As authority for this argument, Barclay relies on our Supreme Court's opinion in *Department of Alcoholic Beverage Control v. Alcoholic Control Appeals Bd.* (2006) 40 Cal.4th 1 (*ABC*).

Barclay misunderstands both the application of the threshold or gateway section of the APA and the manner in which *ABC* applies to the present case.

Government Code section 11410.10 states: "This chapter applies to a decision by an agency if, under the federal or state Constitution or a federal or state statute, an evidentiary hearing

34

for determination of facts is required for formulation and issuance of the decision."

We begin by determining the meaning of this statute.

" ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]  'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*Hassel v. Bird* (2018) 5 Cal.5th 522, 540; accord, *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617.)

The meaning of Government Code section 11410.10 is unambiguous:  The refence to "this chapter" is to Chapter 4.5 of Part 1 of Division 3 of Title 2 of the Government Code.  Provisions regarding the APA Bill of Rights are set out in Article 7 of this chapter.  Thus, for any article in this chapter to be applicable to the Water Board decision at issue, there must be

a provision of the Water Code (or some other statute[25]) that makes the APA applicable.

Barclay has cited no such statute, nor has our independent research identified one; the Water Code contains no statute meeting the requirement of Government Code section 11410.10 for adoption of the APA in the proceedings reviewed in this case.

Instead, as in this case, when the Water Board acts pursuant to Water Code sections 13267 and 13304, the Legislature provided for review of such actions following issuance of cleanup and abatement orders by the state water board and by the courts, as we shall discuss. (Wat. Code, §§ 13320 & 13330, respectively.)

Water Code section 13267 authorizes a regional water board, or the state board, to investigate potential threats to the quality of the waters of the state,[26] including on an emergency basis. This investigative authority of the regional water boards includes (a) the right to ask anyone who has discharged, discharges or is discharging, or is suspected of discharging, or proposes to discharge waste that could affect the quality of the waters of the state to provide the water board with technical and monitoring reports under penalty of perjury; (b) the right to inspect facilities to determine compliance with waste discharge requirements; and (c) the right to issue cleanup and abatement

---

[25]    We consider the other qualifying language of this statute, that referencing the federal and state Constitutions, and another possible, statutory exception, in subsequent sections of this opinion.

[26]    The term "Waters of the state" means "any surface water or groundwater, including saline waters, within the boundaries of the state." (Wat. Code, § 13050, subd. (e).)

orders to remediate the discharge. (Wat. Code, §§ 13267 & 13304, respectively.)[27]

The Legislature's selection of a postcleanup order administrative and judicial review process likely is the result of its determination that the potential threat to the public from waters which are polluted or otherwise present a threat to their health and well-being warrants the later placement and availability of the review process.

The Water Code also provides that "all current record owners of fee title to the site of the proposed action [be] notified of the proposed action by the state board or regional board" (§ 13307.1, subd. (a)), also requiring that the state and regional water boards "shall take all reasonable steps necessary to accommodate responsible landowner participation in the cleanup or site closure process and shall consider all input and recommendations from any responsible landowner wishing to participate." (§ 13307.1, subd. (b).)

Even though Barclay is not a current owner, the Water Board provided it with extensive access to the process in which the Water Board engaged prior to issuance of the RCAO; Barclay had no further *statutory right* to participate.

This determination does not end our consideration of Barclay's contention. We will address other potential sources of

---

[27] A separate provision of the Water Code, section 13301, authorizes the issuance of cease and desist orders; while that statute also requires that such orders "may be issued . . . after notice and hearing," it also does not incorporate any provision of the APA. As we shall discuss, Government Code section 11410.40 provides authority for an agency to adopt portions of the APA, which the State Water Board has done. (See section IV B, below.)

application of the APA in this case—whether either the federal or state Constitutions requires compliance with the APA—after addressing Barclay's argument that the holding in *ABC* mandated the Water Board's compliance with the APA.

Barclay's reliance on *ABC* to support its claim that the APA and its Bill of Rights are applicable in this case is misplaced. The APA applied to the proceeding under review in *ABC* because the Legislature expressly so provided in Business and Professions Code section 24300.[28] By contrast, in the present case, no statute provides for the action of the Water Board at issue here to be subject to the APA, and thus applying the plain language of section 11410.10, Chapter 4.5 of the Government Code, the APA does not apply to the proceedings which led to issuance of the RCAO. Thus, there is no *statutory basis* for application of the APA to Barclay's claims and the trial court's determination that the APA did not apply was correct. (See *Basurto v. Imperial Irrigation District* (2012) 211 Cal.App.4th 866, 881-882 [rejecting argument that the APA applies unless a state agency is specifically excepted from its coverage]; see also *Schutte &*

---

[28] Business and Professions Code section 24300, subdivision (a) provides, in relevant part: "Except as provided in Section 24203 and in this section, the proceedings shall be conducted in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, and in all cases the department shall have all the powers granted therein." Thus, there is in the *ABC* case a specific statutory command that the APA is applicable to those proceedings.

38

*Koerting, Inc. v. Regional Water Quality Control Bd. (2007)* 158 Cal.App.4th 1373, 1387 (*Schutte*).)[29]

The determination that the APA does not apply to proceedings such as those we now review is also supported by the statutory history of the Water Code.  When the Dickey Act was adopted, its section 13061 expressly required that the then-operative version of the APA apply to proceedings concerning whether there had been a discharge contrary to the requirements of the Dickey Act.[30]  This requirement was removed when the

---

[29]    The leading authority on the APA makes a similar point in his treatise on California Administrative Procedure.  There, Professor Michael Asimow writes:  "The APA administrative adjudication provisions do not apply to every state agency 'decision' . . . .  Instead, by statute, those provisions apply *only* 'to a decision by an agency if, under the federal or state Constitution or a federal or state statute, an evidentiary hearing for determination of facts is required for formulation and issuance of the decision.'  [Gov.C. §11410.10]"  (Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2018) ¶ 4:110.)

[30]    That provision is former Water Code section 13061, which required that proceedings to address discharges potentially contrary to the Dickey Act "shall be conducted, as nearly as practicable, in accordance with the provisions of Title 2, Division 3, Part 1, Chapter 5 of the Government Code."  (Former Wat. Code, § 13061 (Stats. 1949, ch. 1549, § 13061, p. 2788.)  That reference was to the chapter of the Government Code which set out the version of the APA then in effect.  (Stats. 1945, ch. 867, § 1, p. 1627, as amended by Stats. 1947, ch. 1425, § 1, p. 2984.).  Former Government Code section 11501, subdivision (b) provided that "[t]he procedure of any agency shall be conducted pursuant to the provision of this chapter only as to those functions to which this chapter is made applicable by the

39

Porter-Cologne Act was adopted. (Compare Stats. 1949, ch. 1549 with Stats. 1969, ch. 482.) Had the Legislature intended to have the APA apply to proceedings such as those now at issue, it had the language at hand by which to continue that requirement; it did not do so. (See *Bertch v. Social Welfare Dept.* (1955) 45 Cal.2d 524 [affirming limitation on application of the former APA as stated in former Gov. Code, § 11501]; overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180.)

## B. Water Board regulations applicable but for Barclay's waiver

We now consider a separate provision of Chapter 3 of the APA which also requires analysis in connection with Barclay's overarching contention that the Water Board violated Barclay's procedural rights by failing to apply the Bill of Rights.

Barclay contends specifically that the Bill of Rights is applicable in this case because Government Code section 11410.40 provides that an agency "may adopt this chapter or any of its provisions for the formulation and issuance of a decision, even though the agency or decision is [otherwise] exempt from application of this chapter."[31]

---

statutes relating to the particular agency." (Stats. 1945, ch. 867, § 1, p. 1627 [former Gov. Code, § 11501, subd. (b)].)

[31] Government Code section 11410.40 provides in full: "Notwithstanding any other provision of this article, by regulation, ordinance, or other appropriate action, an agency may adopt this chapter or any of its provisions for the formulation and issuance of a decision, even though the agency or decision is exempt from application of this chapter."

Barclay points out in this regard that the State Board did adopt a regulation making the Bill of Rights applicable to proceedings before it, California Code of Regulations, title 23, section 648, subdivision (b).[32] This regulation provides: "(b) Incorporation of Applicable Statutes. Except as otherwise provided, all adjudicative proceedings before the State Board, the Regional Boards, or hearing officers or panels appointed by any of those Boards shall be governed by these regulations, chapter 4.5 of the [APA], sections 801-805 of the Evidence Code [addressing expert and opinion testimony], and section 11513 of the Government Code."[33]

---

The article containing the Bill of Rights (art. 6) is within the referenced chapter (Chapter 4.5 of Part 1 of Division 3 of Title 2 of the Government Code).

[32] We take judicial notice of this and the other regulations we now discuss. (Evid. Code, §§ 452, subds. (b), (c), 459.)

[33] California Code of Regulations, title 23, section 648, subdivision (a) defines an "adjudicative proceeding" as "an evidentiary hearing for determination of facts pursuant to which the State Board or a Regional Board formulates and issues a decision."

There is an argument that proceedings involving the issuance of a cease and desist order are not adjudicative within the meaning of this section, but instead constitute administrative investigations in which the agency offers both notice and an opportunity to participate. In the text, we explain why, assuming arguendo, the proceedings are adjudicative, Barclay was accorded extensive rights to participate and only after an extended opportunity to do so—of which it took full advantage—waived any right it may have had to a "formal proceeding."

While the regulation cited by Barclay so provides, there are other regulations that must be considered in assessing whether Barclay's contention has merit.

Subdivision (c) of section 648, title 23 of the California Code of Regulations, limits application of the provisions Barclay seeks to apply. This subdivision provides in part: "Except as provided in subdivision (b) of this section, chapter 5 of the [APA] does not apply to hearings before the State Board or any of the Regional Boards, or hearing officers or panels appointed by those Boards."

Reading subdivisions (b) and (c) of section 648 of title 23 of the California Code of Regulations together, the resulting rule

---

Government Code section 11513 sets out rules of evidentiary procedure differing in several respects from those applicable in court trials, providing, inter alia: (c) "[t]he hearing need not be conducted according to technical rules relating to evidence and witnesses, except as hereinafter provided. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions. [¶] (d) Hearsay evidence may be used for the purpose of supplementing or explaining other evidence but over timely objection shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. An objection is timely if made before submission of the case or on reconsideration."

This regulation established the authority of the Water Board and of the trial court to take into evidence the declaration of Barclay's engineer, Bach, who supervised development at the Site, even though his declaration was not made under penalty of perjury. (Cf. Code Civ. Proc., § 2015.5.) Barclay's contention that consideration of this declaration was error is without merit based on these authorities.

implementing the potential application of the APA according to subdivision (c) is that no provision of the APA applies unless subdivision (b) requires it:  subdivision (b) explains that the APA applies—except when another provision states that it does not apply.

We find the rule operative in the present case in subdivision (d) of the section 648 and in section 648.7 of title 23 of the California Code of Regulations.  The former authorizes the agency officer presiding over a matter to "waive any requirements in these regulations pertaining to the conduct of adjudicative proceedings including but not limited to the introduction of evidence, the order of proceeding, the examination or cross-examination of witnesses, and the presentation of argument, so long as those requirements are not mandated by state or federal statute or by the state or federal constitutions."

The latter provides that a party waives provisions otherwise applicable if the request to have them apply is untimely.  Thus, California Code of Regulations, title 23, section 648.7 provides:  "An objection by a party, either in writing or at the hearing, to the decision to hold an informal hearing shall be resolved by the presiding officer before going ahead under the informal procedure.  *Failure to make a timely objection to the use of informal hearing procedures before those procedures are used will constitute consent to an informal hearing.*"  (Italics added.)

This requirement for timely assertion of any objection to the hearing procedure utilized by the Water Board appears in a statute as well.  Government Code section 11445.30 includes a requirement that any objection by a party to use of the informal hearing procedure shall be made in the party's pleading.  (*Id.*, subd. (b).)  This mandate for timely raising this procedural point

is emphasized in the language of subdivision (c) of Government Code section 11445.30, which states:  If an objection is made to use of the informal hearing procedure, it "shall be resolved by the presiding officer before the hearing on the basis of the pleadings and any written submissions."[34]  (*Id*., subd. (c).)

There is no dispute among the parties in the present matter that the proceedings before the Water Board were conducted informally.  At the same time, the record makes clear that, beginning with the notice issued on October 31, 2013, the proceedings were conducted by a series of written submissions.

And, these proceedings were extensive; Barclay made multiple written responses to requests to it made by the Water Board, and was given multiple opportunities to respond to submissions made by Shell and to memoranda and to documents prepared in draft by the Water Board.  Barclay's submissions included declarations of lay and expert witnesses, all overseen and explained in detail by its counsel.  During this period, Barclay asked for, and was granted, lengthy extensions of time in which to prepare and present its own extensive arguments and documentary submissions and to respond to submissions by Shell and by Water Board SCP Staff.  Barclay's submissions totaled over 11,000 pages.

---

[34]  Government Code section 11445.40 gives broad latitude to the agency officer conducting the administrative proceeding.  Its subdivision (b) provides: "In an informal hearing the presiding officer shall regulate the course of the proceeding.  The presiding officer shall permit the parties and may permit others to offer written or oral comments on the issues.  The presiding officer may limit the use of witnesses, testimony, evidence, and argument, and may limit or eliminate the use of pleadings, intervention, discovery, prehearing conferences, and rebuttal."

It was not until December 24, 2014, that Barclay first asked for a formal hearing. In response, the Water Board explained that the procedure which had been utilized for over a year had allowed for orderly and extensive submissions by all parties and for extensive explications of views by the parties—and denied the request.[35]

Thus, pursuant to section 648.7 of title 23, California Code of Regulations, by waiting over a year to make a request for a formal hearing—during which it had fully participated in the Water Board's inquiry—Barclay waived the opportunity to proceed more formally. In addition, we perceive no denial of fair hearing procedures given the extensive and unfettered multiple opportunities Barclay was given—and accepted—to express and document its position through counsel and expert and lay witnesses.

**C.     Relationship of APA fair hearing procedures and Code of Civil Procedure section 1094.5**

Barclay contends the APA and its Bill of Rights necessarily apply in this case because the intent of the drafters of the APA was to incorporate the terms of the APA into adjudication of petitions for writs of mandate regarding regional water board

---

[35]     Barclay argues other regional water boards follow different procedures and makes an argument based on memoranda of the Chief Counsel of the Water Board. As the documents upon which it bases these arguments are not part of the administrative record admitted by the trial court with respect to its adjudication of Barclay's Amended Petition for Writ of Administrative Mandamus, and were not promulgated in compliance with Government Code section 11340.5, we do not consider them in our analysis of Barclay's contentions on appeal.

decisions in superior court pursuant to Code of Civil Procedure section 1094.5. While Barclay correctly acknowledges that this statute is the means by which actions of regional water boards are reviewed in superior court, it errs in its claim that the APA is engrafted into the Code of Civil Procedure statute by reference to that provision in Water Code section 13330.[36]

In support of this contention Barclay cites the Law Revision Commission comment to Government Code section 11410.10, which states, "[t]he coverage of [the APA] is the same as coverage by the existing provision for administrative mandamus under Code of Civil Procedure Section 1094.5(a)." (Cal. Law Revision Com. com., Deering's Ann. Gov. Code, *supra*, foll. § 1410.10, p. 120.)

What Barclay does not acknowledge, and as we have explained above, is that for Government Code section 11410.10 to apply, *another statute*—in this case a provision of the Water Code—must state that the APA is applicable. The Law Revision Commission comment does not address this aspect of Government Code section 11410.10, and nothing in the Law Revision Commission comment suggests otherwise. Thus, the comment does not provide support for Barclay's claim.

Barclay does not err, however, in noting that there is a fair hearing provision within the text of Code of Civil Procedure section 1094.5 which must be considered. Code of Civil Procedure

---

[36]    Water Code section 13330, subdivision (b) provides: "A party aggrieved by a final decision or order of a regional board subject to review under Section 13320 may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate not later than 30 days from the date on which the state board denies review."

1094.5, subdivision (b) provides in part: "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; *whether there was a fair trial*; and whether there was any prejudicial abuse of discretion." (Italics added.)

Relying on the italicized clause, Barclay contends, "[t]he APA applies to any state agency proceedings reviewable under Code of Civil Procedure section 1094.5, subdivision (a)." In addition, it argues "the text of the APA itself makes clear that . . . [if] section 1094.5 applies to the review of an agency decision, then that decision is subject to the APA." As with the claim just discussed, Barclay supports this claim with citations to Government Code section 11410.10 and to a California Law Revision Commission comment to this Government Code section.

Barclay's argument based on the cited Law Revision Commission comment lacks persuasive force. The passage upon which Barclay relies is an introductory sentence of a paragraph of the Law Revision Commission's comment on this section, which reads in full: "The coverage of this chapter is the same as coverage by the existing provision for administrative mandamus under Code of Civil Procedure section 1094.5(a)." (Cal. Law Revision Com. com., Deering's Ann. Gov. Code, *supra*, foll. § 1410.10, p. 120.) That is not a statement that this Government Code provision is engrafted into Code of Civil Procedure section 1094.5; an express statement of incorporation would be required to accomplish this task. And, the remainder of the cited paragraph describes when and how Code of Civil Procedure section 1094.5 applies to review of actions by administrative agencies generally and focuses on how that section had been

47

applied to review actions of state agencies prior to enactment of the APA.

There is nothing in the language upon which Barclay relies indicating that Government Code section 11410.10 is to be read to ignore the clause in it that limits application of the APA as set out *in that section*. For Barclay's argument to have merit, section 11410.10 must contain language that the APA applies to actions reviewed under Code of Civil Procedure section 1094.5. Yet, neither the text of either statute nor the Law Revision Commission comment supports Barclay's argument. Thus, Barclay's contention that the Legislature engrafted the APA into section 1094.5—without any statutory statement to that effect— is mistaken.

Nor does the circumstance that Water Code section 13330, subdivision (e) states that a court proceeding such as the present one may be pursued by a petition under Code of Civil Procedure section 1094.5 support Barclay's argument. If the Legislature had intended that the APA or its Bill of Rights apply in such a proceeding notwithstanding the clear language of Government Code section 11410.10, it would have so stated in the same statute. The Legislature did not do so.[37]

---

[37] We recognize the arguably anomalous circumstance that review of final actions by regional water boards for which the state water board has denied review is by means of a petition for writ of mandate under Code of Civil Procedure section 1094.5, which more typically is the appropriate means of review of final administrative actions following proceedings in which "a hearing is required to be given, evidence is required to be taken" (Code Civ. Proc., § 1094.5, subd. (a)), notwithstanding that the Water Code does not call for such a hearing in connection with issuance of cleanup and abatement orders. That anomaly is a result of a

48

### D. Constitutional due process claims

Barclay contends the APA and its Bill of Rights apply based on the clause in Government Code section 11410.10 that makes due process principles applicable "if, under the federal or state Constitution . . . an evidentiary hearing for determination of facts is required for formulation and issuance of the decision."[38]

---

drafting choice made by the Legislature. (See *Schutte, supra,* 158 Cal.App.4th at pp. 1383-1387.)

There is a potential, albeit limited, incorporation of APA provisions that can apply under certain circumstances. Title 23 of the California Code of Regulations section 648.7 vests in the hearing officer "the discretion to determine whether a matter will be heard pursuant to the informal hearing procedures set forth in [the Bill of Rights]." And, title 23 of the California Code of Regulations section 648.5, subdivision (b) incorporates the Bill of Rights into procedures to be followed by the Water Board, modifying when provisions of the Bill of Rights may apply. However, as we have explained in the text, section 648.7 requires that a party make a timely objection to use of less formal procedures; the failure to do so constitutes a waiver of any right to demand that the agency conduct its inquiry in a more formal manner.

[38] Barclay's argument based on this prong of Government Code section 11410.10 cites federal cases (with a single exception) and analyzes the issue using the three-factor federal due process test, involving inquiries into (a) the importance of the private interest at issue, (b) the risk of erroneous deprivation of that interest and the probable value of the additional safeguards sought by the private party asserting it, and (c) the governmental interest involved. (E.g., *Mathews v. Eldridge* (1976) 424 U.S. 319, 335.) Our state constitutional due process analysis utilizes a four-factor test, adding the "dignitary interest in providing notice and hearing" to the individual. There is also a difference in how

The Water Board and Shell raise a threshold issue, arguing Barclay waived its due process claim by "fail[ing] to exhaust available administrative remedies" below. Barclay responds to these arguments in a footnote in its reply brief, arguing it did raise its due process objection before the RCAO was issued, citing its December 24, 2014 letter, which included its request for a formal hearing before the Water Board at which it would "directly address the question whether Barclay is a 'discharger' under the Water Code," and in two later letters (those of January 6 and 16, 2015), in which it also sought a formal hearing.

There are three difficulties with Barclay's reply counter-arguments. First, the same regulations upon which it relies for other contentions—title 23 of the California Code of Regulations, sections 648 through 648.9—include the provision discussed above requiring that a party seeking to invoke more formal hearing requirements (to the extent the Water Board has adopted them) must make that claim *at the outset of the investigation*, or *it is waived*. (Cal. Code Regs., tit. 23, § 648.7 ["Failure to make a timely objection to the use of informal hearing procedures before those procedures are used will constitute consent to an informal

_____

the tests are applied. (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 565.)

Because Barclay's argument relies on the three-factor federal test, we address its claim in that context. And, as Barclay advances no argument that the state due process test would produce a different result, we do not address whether the outcome might be different if the four-factor state due process analysis were used. (See *Saleeby v. State Bar, supra,* 39 Cal.3d at p. 565 & Asimow et al., Cal. Practice Guide: Administrative Law, *supra,* ¶¶ 3.181, 3.544.)

50

hearing."])  Thus, the Water Board's regulations gave notice of how and when to make the claims Barclay now seeks to assert; those regulations also indicate that Barclay's request that its claims be resolved by a procedure different than that in which it had participated without objection for more than a year was untimely.

Second, even if Barclay had not waived its argument, it does not provide citations to the record that provide support for its claim.[39]  Third, the cases upon which it relies do not support its defense.  Barclay's reliance on *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1211-1212, is inapposite as that case addresses a very different procedural circumstance, whether a party must contest an exemption determination under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) prior to seeking review of that determination in court when no administrative remedy is provided.  That court observed that the exhaustion requirement applied when there was an opportunity for "public comment" or there is a public hearing; however, a party could not be required to exhaust when the agency had not yet issued the ruling and the statute of limitations might expire if the party did not file suit even though the ruling had not yet been made.  (*Azusa Land, supra,* 52 Cal.App.4th at pp. 1209-1211.)  In this case, there were extensive opportunities for comment of which Barclay took full advantage.

---

[39]     The only citations to the record which Barclay provides are to the December 24, 2014 letter and two January 2015 letters, which as we discuss in the text, above, were untimely assertions of its claim based on the regulation cited there.

The holding in the second case, *Schutte, supra,* 158 Cal.App.4th 1373, of relevance here, is that a party which appealed to the State Water Quality Control Board from an adverse determination by a regional water quality control board and has been denied review by the state board, need not return to the regional water board but must file its petition for writ of mandate within the time required by Water Code section 13330, subdivision (b).  It is in the context of compliance with the filing deadline of this statute that the court in *Schutte* addresses the issue of exhaustion.  Nothing in *Schutte* addresses the scope of issues that must first be presented to a regional water board to meet the "jurisdictional prerequisite" of exhaustion of administrative remedies.  (See *Schutte,* at p. 1385, quoting *Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 589.)

Even if Barclay had not waived this issue, we would find Barclay's contention lacking in merit for the following reasons.

Barclay bases its due process claim on *Mathews, supra,* 424 U.S. 319, 335, *Leslie's Pool Mart, Inc. v. Department of Food & Agriculture* (1990) 223 Cal.App.3d 1524 (*Leslie's*), and *Lassiter v. Department of Social Services* (1981) 452 U.S. 18.

As the Water Board argues, *Mathews* calls for a more nuanced approach than that which Barclay advocates.  Thus, in the course of its opinion, the *Mathews* court points out that what is needed to comport with federal due process principles is "some form of hearing . . . before an individual is finally deprived of a property interest." (*Mathews, supra*, 424 U.S. at p. 333.)  The *Mathews* court then listed a series of cases in which the principles of due process were vindicated, some by an evidentiary hearing prior to deprivation of a property interest, and others in

52

which due process was achieved by a hearing after the action was taken, e.g., when the sanction of termination of employment had been effected. (*Id.* at pp. 333-334.)

"These decisions underscore the truism that ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett v. Kennedy*, [416 U.S. 134,] 167-168 [1974] (Powell, J., concurring in part); *Goldberg v. Kelly,* [397 U.S. 254,] 263-266 [1970]; *Cafeteria Workers v. McElroy, supra,* at 895. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e. g., *Goldberg v. Kelly, supra*, at 263-271." (*Mathews, supra,* 424 U.S. at pp. 334-335.)

In addressing the three factors identified in *Mathews*, Barclay argues with respect to the first, its private interest, that it has a profound private interest in having a formal hearing

53

before it is added as a responsible party to the RCAO because that action results in it being jointly and severally liable for remediation costs at the Site, which are estimated to be $146 million. Addressing the second factor, the risk of an erroneous deprivation of that private interest, Barclay argues there is a "dense and disputed factual record spanning tens of thousands of pages, concerning conduct that occurred more than fifty years ago." Third, the government's interest is minor as there is no need for an early resolution of the matter because "Shell is already cleaning up the site, and the only question is whether Barclay will defray Shell's costs." Barclay also points out there is no harm in any delay based on "the fact that it took *four years* for Barclay to be added to the Order."

We are not persuaded by Barclay's arguments. As the Water Board argues, also relying on *Mathews*, Barclay's right to due process was met through the several opportunities which the Water Board provided to Barclay to address the entire range of issues presented in the proceeding before it. This is amply demonstrated by Barclay providing thousands of pages addressing the issues, including multiple lengthy letters from its lawyers explaining Barclay's views on the issues presented, together with several expert witness and lay witness declarations, and doing so as part of an iterative process in which there were extensive analyses of the issues as they developed over the multi-year course of the Water Board's investigation of the Site and the preparation and revision of the RCAO. As the Water Board argues, these opportunities allowed Barclay to fully express its views as to the impact of its being added as a responsible party to the RCAO and to fully address Barclay's "private interest."

54

With respect to Barclay's claim that there is a "dense and disputed factual record," the scientific evidence in the record conclusively establishes there is an extensive and continuing risk of harm—magnified in substantial part by Barclay's activities at the Site—to the people who live at the Site, which was graded by Barclay's designee to create the lots sold by Barclay to the public.[40] In this case, no additional procedural safeguard is required:  Barclay was given several extended opportunities to address the issues and had the right to obtain this appellate review of the Water Board's determination—a postadministrative agency action review which meets the constitutional standard articulated in *Mathews*.

The third *Mathews* factor, the governmental interest, is substantial.  Among the functions of the Water Board is the protection and improvement of the quality of the " '[w]aters of the

---

[40]    Barclay's argument that there is scientific evidence contrary to other such evidence, which the Water Board found to be determinative, is not sufficient to overcome the Water Board's findings which were affirmed by the trial court in its order and judgment.  The question on appeal is "whether the evidence reveals substantial support, contradicted or uncontradicted," in favor of the trial court's determination.  (*Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 72.)  The answer to that question in this case is that the evidence does establish substantial support for the factual determinations below.

Equally established is that, with knowledge of the presence of petroleum residue and waste in various forms, Barclay removed only a small portion of that material from the Site, burying most of it beneath the building pads it graded and created utilizing a mixture of petroleum residue and waste from the berms and beneath the concrete bottoms of the three reservoirs together with soil brought to the Site from elsewhere.

state' " consistent with the state goal of providing "a decent home and suitable living environment for every Californian." (Wat. Code, §§ 13050, subd. (e), 13142, subd. (c).) It is evident in this case that the RCAO was issued to further this objective. Barclay's argument that there is no hurry because the process of identifying those responsible has taken four years fails to acknowledge that the delay was in significant part the result of Barclay's own multiple requests for extensions of time so that it could present its views and materials to support them—at a pace Barclay found appropriate.

We do not agree with Barclay that the circumstance that Shell is already cleaning the Site should be a consideration in whether Barclay should have obtained a formal hearing prior to issuance of the RCAO. In addition to Barclay's failure to raise this as an issue below, we agree with the Water Board that this is not an issue that should be addressed as part of analysis of which parties may bear responsibility for cleanup and abatement.

The parties dispute the application of *Machado v. State Water Resources Control Bd.* (2001) 90 Cal.App.4th 720 (*Machado*), to the present case. There, the Third District Court of Appeal addressed whether the due process rights of the appellants in that case (a dairy) were violated by the issuance of a cleanup and abatement order prior to a hearing. Relying in large part on the principles articulated in *Mathews*, the *Machado* court held that due process principles were satisfied when the hearing is provided following issuance of a cleanup and abatement order. (*Machado, supra*, 90 Cal.App.4th at pp. 725-726.) In reaching this conclusion, the *Machado* court analyzed the three *Mathews* factors and concluded the dairy had been afforded due process, reasoning that because the cleanup and

56

abatement order there did not impose criminal or civil penalties there was no substantial deprivation of the private interest of the dairy. (*Machado, supra*, 90 Cal.App.4th at p. 726.)

With respect to the issue of timing of the availability of a fair hearing on the Water Board's action, the *Machado* court specifically found the dairy's right to due process was met by its right to seek review of the cleanup order before the state board and in its right to challenge the regional water board's order through a petition for writ of mandate. (*Machado, supra*, 90 Cal.App.4th at p. 726.) In support of this determination, the court relied on *Mathews*: "As the United States Supreme Court noted, 'The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations. [Citation.] . . . [Citation.] [W]hen prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be.' (*Mackey v. Montrym* (1979) 443 U.S. 1, 13 (*Mackey*).) Moreover, in assessing what process is due, a reviewing court must give substantial deference to the good faith judgment of the agency that its procedures afford fair consideration of a party's claims. (*Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 289; *Mathews, supra,* 424 U.S. at p. 349.)" (*Machado, supra,* 90 Cal.App.4th at p. 726.)

Addressing the third *Mathews* factor, the *Machado* court explained the need for issuance of the cleanup order with reference to the reasons for a governmental water quality control program: "That brings us to the third factor in *Mathews*, the

governmental interest involved. The statewide program for water quality control is designed to ensure the health, safety and welfare of all Californians. (§ 13000.) Cleanup and abatement orders serve an important function in meeting this goal." (*Machado, supra*, 90 Cal.App.4th at p. 727, citing Wat. Code, § 13304, subd. (a).)

We appreciate that there is a difference between the facts in *Machado* and those in the present case; there, the dairy "was discharging manure and wastewater into a ditch that flowed into a drainage system and then into the Sacramento-San Joaquin Delta." (*Machado, supra*, 90 Cal.App.4th at p. 723.) That the hazardous substances in the present case are buried is not a significant enough distinction to overcome the health hazards which the facts conclusively establish. Indeed, the Porter-Cologne Act defines the key term "waters of the state" as "any surface water *or groundwater* . . . . (Wat. Code, § 13050, subd. (e), italics added.) Thus, the governmental interest in protecting both the persons living at the Site and the aquifers beneath it are appropriately given great weight whether the water flows on, or under, the surface.[41]

In our weighing of the three *Mathews* factors, we conclude that Barclay was accorded appropriate due process by pursuing its claims before the State Board, in the trial court, and now on

---

[41] The Porter-Cologne Act definition is identical in relevant respects to that in the Dickey Act, which defined the term "waters of the state" as "any waters, surface or underground." (Former Wat. Code, § 13005.) We perceive no legal difference between the terms "groundwater" and "waters . . . underground" as these terms are used in the Porter-Cologne Act and in the Dickey Act, respectively.

appeal.  As the United States Supreme Court held in *Mathews*, the specific form which due process takes is flexible and may vary with the nature of the issue presented; a full evidentiary hearing is not always required prior to an agency issuing an order which is subject to post-issuance review, as in the present case.  (See *Matthews, supra*, 424 U.S. at p. 334.)

Barclay's reliance on *Leslie's, supra,* 223 Cal.App.3d 1524, a case predating *Machado*, is unpersuasive.  There, the agency seized a product from the plaintiff's retail stores without notice because it was being sold without Leslie's first having obtained the registration required by the Economic Poisons Act (Food & Agr. Code, § 12751 et seq.; *Leslie's,* at pp. 1528-1529.)  The court expressly limited its holding, writing that there was no evidence the product was a threat to the environment or to the health of the public or that the product could not obtain registration when applied for.  The *Leslie's* court also noted the Economic Poisons Act does not provide for a postseizure review.  (*Leslie's,* at p. 1536.)

Barclay's circumstances are materially different from those in *Leslie's*.  Here, no property was seized; no registerable merchandise on store shelves ready for sale was confiscated.  Unlike the action without notice that characterizes the facts in *Leslie's*, in this case, the allocation of shared responsibility for the cleanup of a hazardous substance came only after an extended period of time and much discussion and analysis—the Water Board having given multiple notices to Barclay and having allowed it multiple opportunities to be heard on the merits before the RCAO was issued—with the additional availability of court review of the Water Board's determination.  And, rather than the containers on the store shelves in *Leslie's*, which literally

59

*contained* the potentially hazardous substance, in the present case, there is substantial evidence that hazardous substances are already in, and continue to leach into, the water supply—with the potential to endanger human health.

### V. *Relationship between Water Board Executive Officer and Chief Deputy Executive Officer and combination of functions within the Water Board*

Interspersed in Barclay's opening brief are arguments that its due process rights were violated because (a) Executive Officer Unger was both the "prosecutor" and supervisor of Chief Deputy Executive Officer Smith who supervised the inquiry into issues resulting in the issuance of the RCAO and (b) there was an improper combination of functions within a single agency.[42]

The *improper delegation* prong of this argument is based on memoranda which the trial court did not admit into evidence in connection with Barclay's petition[43] and thus are not properly

---

[42] Barclay articulates its arguments by assigning the labels "adjudicator" and "prosecutor" to Water Board personnel, citing Government Code section 11425.30 and a Water Board memorandum as sources for these labels. The term "prosecutor" does appear in the cited Government Code section, but the term "adjudicator" does not. Use of these terms does not advance Barclay's underlying claims, which we find to be without merit for reasons discussed in the body of our opinion.

[43] In response to a letter we sent the parties, Barclay confirmed that the memoranda upon which it relies for this argument were not admitted into evidence by the trial court in connection with its petition for writ of mandate although they had been admitted earlier in connection with the Water Board's demurrer and motion to strike. We do not grant the request that

60

considered as part of the record before us; we may reject this contention for want of a proper record. (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 366, fn. 8; *Lona v. Citibank, N.A* (2011) 202 Cal.App.4th 89, 102; *Princess Cruise Lines, Ltd. v. Superior Court* (2009) 179 Cal.App.4th 36, 45.)

Even were those materials in the record, Barclay's argument ignores that Water Code section 7 expressly authorized the delegation of authority to conduct proceedings by the executive officer to a deputy executive officer. That section provides: "Whenever a power is granted to, or a duty is imposed upon, a public officer, the power may be exercised or the duty may be performed by a deputy of the officer or by a person authorized, pursuant to law, by the officer, unless this code expressly provides otherwise." No relevant provision of the Water Code restricts this authority.

Barclay's argument that there was an *improper combination* of investigative, prosecutorial and adjudicatory functions within the Water Board ignores that combinations of such functions are characteristic of administrative agencies. Our Supreme Court, and the United States Supreme Court, have each repeatedly held that such combinations of functions do not violate the due process rights of those under scrutiny by such "unitary agencies." For example, in *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, our Supreme Court explained: "By itself, the combination of investigative, prosecutorial, and adjudicatory functions within a

we take judicial notice of these memoranda for the first time on appeal, as we explained in section III, above.

61

single administrative agency does not create an unacceptable risk of bias and thus does not violate the due process rights of individuals who are subjected to agency prosecutions.  (*Withrow v. Larkin* [1975] 421 U.S. 35, 54; see *Adams v. Commission on Judicial Performance* (1995) 10 Cal.4th 866, 880-884; *Kloepfer v. Commission on Judicial Performance* (1989) 49 Cal.3d 826, 833-835; Pierce, Administrative Law Treatise (4th ed. 2002) § 9.9, pp. 688-689.)  Thus, '[p]rocedural fairness does not mandate the dissolution of unitary agencies, but it does require some internal separation between advocates and decision makers to preserve neutrality.'  ([*ABC, supra*,] 40 Cal.4th [at p.] 10.)"  (*Id*. at p. 737.)  Also, Barclay's claims of an improper combination of functions within the Water Board lack factual support in the record.

## VI.   *The conflict of interest argument based on Shell's payment to the State Water Control Fund*

Barclay contends the RCAO must be overturned due to "a clear conflict of interest" based on the circumstance that Shell paid the State Water Board more than $52,000 "for the approximately 430 hours spent by the [Water Board] to investigate and name Barclay to the Order."  Barclay further argues it "is irrelevant that Shell's payments went into the State Board's coffers rather than the pockets of individual staff members."  Citing *People v. Eubanks* (2017) 14 Cal.4th 580, Barclay argues there is a reasonable possibility that Shell's payments influenced the decision to add Barclay to the RCAO.  And, while acknowledging the existence of Water Code section 13304, Barclay asserts there is no justification for the payments.  We do not agree.

First, the Water Code authorized the creation of, and payments to, the State Water Pollution Cleanup Fund and the

State Water Pollution Cleanup and Abatement Account of that fund so that the state will be able to recover its reasonable expenses incurred in overseeing investigations into, and cleanup and abatement of, unpermitted discharges which adversely affect the state's waters. There are statutory restrictions on charges to entities determined to be required to clean up and abate contaminated sites and on deposit of amounts assessed into these accounts, as well as statutory control on the purposes for which funds may be withdrawn from the accounts. (See, e.g., Wat. Code, § 13440 [creating the State Water Quality Control Fund and the State Water Pollution Cleanup and Abatement Account]; Wat. Code, § 13304, subd. (c) [authorizing assessment of the reasonable costs incurred by a regional water board in connection with cleanup and abatement orders]; Wat. Code, § 13365 [authorizing, inter alia, the method for establishing rates and amounts to be billed to parties subject to water board cleanup orders and the mechanism for billing]; & Wat. Code, § 13441 [establishing parameters for payments to and withdrawals from the State Water Quality Control Fund and the State Water Pollution Cleanup and Abatement Account].)

The cited statutes, and others, carefully limit both the charges allowable and the disposition of amounts collected. The statutory plan expressly allows billing dischargers for a regional water board's costs incurred in connection with enforcing its orders; the charges are carefully limited by the statutes and there is no direct relationship between the amounts charged and collected and whether another party should be added as a responsible party. At the same time, costs which the regional water boards are authorized by statute to recover include those incurred in conducting and overseeing investigations, analysis,

63

planning, implementation, remedial work and supervising cleanup and abatement activities. (Wat. Code, §§ 13304, 13365, 13267.)

Second, the charges upon which Barclay relies for its "evidence" of improper payments were incurred in part to determine if a second party should be added as a responsible party. That purpose is entirely appropriate and statutorily sanctioned as it carries out a legitimate state function of assigning responsibility for cleanup and abatement to all of the parties responsible for the contamination.[44]

Third, Barclay's assertion that, ". . . [Shell] has underwritten a years-long effort to pin responsibility for its own *oil discharges* on an unsuspecting residential real estate developer by paying for [specified] time [of the Water Board staff]" lacks factual support. Our review of the invoices upon which Barclay bases this argument do not support it. For example, the fact that Water Board staffer Tintut-Williams recorded on his time sheet that he attended a meeting at which the revised CAO was discussed does not support the assertion in Barclay's opening brief that "Prosecution Team [Barclay's team] members [met] at Shell's request to be lobbied by Shell to reopen the comment period on whether to name Barclay." Nor does the fact that the same Water Board staffer " 'Finalized and mailed

---

[44]     As noted earlier in this opinion, the Water Board has requested that we take judicial notice of three documents which confirm the duties the Water Board performed in connection with its order for cleanup and abatement at this Site. As there was no opposition to this request, we grant it. We would reach the conclusion stated in the text were these documents not in the record.

64

out the Notice of Opportunity for additional Public Comment Re: Revised CAO for Dole' " indicate any improper contact by Shell.

Other time entries during the same month (May 2014) include this Water Board staff member's attendance at Carson City Council meetings and participation in an interagency conference call concerning the Site. These entries do not support Barclay's claim.

Barclay's specific assertion that Shell paid more than $52,000 for 430 hours spent by Water Board staff "to investigate and name Barclay to the Order" is not supported by the record. The source of this amount is a declaration (and exhibit attached to it) by Barclay's counsel in which he has "estimated that Shell paid $52,501.33 to reimburse the Board" based on information he "extracted" from various reports. There is no explanation of the criteria he used to make the table he attaches to his declaration, or for the total he hypothecates. The invoices contained at the location in the Administrative Record which Barclay's counsel cites indicate that payments were deposited in the State Water Resources Control Board SCP Program in Sacramento.[45] Nor

---

[45] The authorization for assessing charges to Shell and the requirement that those amounts be paid into a specific state fund controlled by the State Water Board rather than the regional water board, to be disbursed only for specific purposes, is derived from Water Code sections 13304, 13365, 13440-13443.

Shell was notified of its obligation to make payments to this statewide fund by letter. This fact is established by a letter of May 8, 2008, of which we take judicial notice pursuant to the unopposed request that we do so, filed by the Water Board on September 10, 2018. (The document is exhibit 1 to that request.) (Evid. Code, § 452, subd. (c) [official act of state agency]). As required by law, the Water Board sent letters in subsequent

65

does Barclay's citation to the Water Board staff's analysis of Barclay's extensive comment letter of January 21, 2014, lead to a legitimate inference that Shell had any influence on how the staff analyzed issues raised in Barclay's letter. On its face, the staff analysis (which extends for 97 pages) discusses both Barclay's and the Water Board staff's views on literally hundreds of issues—comments that appear on their face to be analytical rather than partisan.

Barclay also does not indicate how money deposited in the State Water Pollution Cleanup and Abatement Account of the State Water Pollution Cleanup Fund is allocated by the State Board among the nine regional boards, nor does Barclay provide any evidence of any "quid pro quo" connection to link amounts billed to and paid by Shell to this state fund to the Water Board's determination that Barclay also has responsibility for cleaning up and abating the pollution at the Site. Use of the monies deposited into that fund is restricted under additional provisions of sections 13442, 13442.5 and 13443 of the Water Code. Thus, there is no evidence to support any direct or indirect link between the Los Angeles Regional Water Board's activities in carrying out its responsibilities and Shell's statutorily mandated payments to this fund.

Barclay's argument would be flawed legally even if there were facts to support it.[46] The rule against pecuniary bias

years with estimates of amounts the Water Board expected to bill Shell. These documents are exhibits 2 and 3 to the same unopposed request. We grant the request for judicial notice of these records of this public agency on the same basis.

[46] Our review of this issue is based on a different legal standard. Instead of balancing the interests of the parties, as we

prohibits a decision maker from having a direct, personal and substantial pecuniary interest in making a determination adverse to a party.  Our Supreme Court considered the issue of pecuniary bias on the part of an "adjudicator" in *Fresh Start, supra,* 57 Cal.4th 197.  There, the claim was that the defendant agency had a financial incentive to favor schools under its control over those operated by the plaintiff, the operator of charter schools, and that this financial interest led the defendant to revoke the charter of the plaintiff to operate those charter schools.

Observing there were precedents which recognized that due process might be violated under circumstances in which individual members of an administrative board could benefit from the board's rulings, our Supreme Court noted that the party challenging an action by an administrative board must identify the personal interest of the agency member that might impair the ability of the individual member(s) of that board to act.  In absence of identification of such a personal interest, the claim of bias based on pecuniary interest would fail.  (*Fresh Start, supra*, 57 Cal.4th at pp. 216-217; accord, *Burrell v. City of Los Angeles* (1989) 209 Cal.App.3d 568, 582 ["[A] party seeking to show bias or prejudice on the part of an administrative decisionmaker

---

do when we review claims raising issues of due process (e.g., under *Matthews, supra,* 424 U.S. 319), "[t]he rule against financial interests stops short of zero tolerance; the United States Supreme Court has recognized that slight pecuniary interests are not constitutionally cognizable.  (*Aetna Life Insurance Co. v. Lavoie* [1986] 475 U.S. [813,] 825-826, fn. 3.)"  (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 216, fn. 8 (*Fresh Start*).)

[must] prove the same with concrete facts: ' "Bias and prejudice are never implied and must be established by clear averments." ' "].)

As our Supreme Court held in *Fresh Start*, to prevail on its due process claim predicated on alleged bias, Barclay must establish an " 'exceptional case presenting extreme facts.' " (*Fresh Start, supra*, 57 Cal.4th at p. 219.)

The Water Board points out that there is no evidence that Chief Deputy Executive Officer Smith, the Water Board official who made the final determination to add Barclay as a discharger and responsible party to the RCAO, stood to receive any personal financial benefit from that decision. Nor is there any evidence Shell was charged for the time Smith took to decide to issue the RCAO or even that the Water Board had any control over funds which Shell paid to the State Board. Nor is there any evidence the Water Board's budget depended in any way on payments Shell made to the State Board.

Barclay's reliance on *People v Eubanks* (1996) 14 Cal.4th 580, a case addressing whether a conflict of interest requiring disqualification under Penal Code section 1424[47] was created by a contribution to a district attorney's office from a crime victim to help cover investigative costs in the matter which the district attorney was investigating, is simply inapposite. For example,

---

[47] Penal Code section 1424 establishes a procedure for making and determining motions to disqualify a district attorney from "performing an authorized duty." Granting a motion to disqualify under this statute requires the trial court to make a finding that "the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (*Id.*, subd. (a)(1).)

Shell is not a crime victim and the amounts it paid are not contributions to the Water Board, but statutorily mandated payments to a fund administered by a different (albeit related) agency.

"Bias and prejudice are not implied and must be clearly established. A party's unilateral perception of bias cannot alone serve as a basis for disqualification. Prejudice must be shown against a particular party and it must be significant enough to impair the adjudicator's impartiality. The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice." (*Gray v. City of Gustine* (1990) 224 Cal.App.3d 621, 632.)

" '[A]dvance knowledge of adjudicative facts that are in dispute . . . does not disqualify the members of an adjudicatory body from adjudicating a dispute . . . . [T]here must be . . . a commitment to a result (albeit, perhaps, even a tentative commitment), before the process will be found violative of due process.' (*BreakZone Billiards v. City of Torrance* [(2000)] 81 Cal.App.4th [1205,] 1236.)" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 841.)

There is no such evidence in the present case.

## VII. *Barclay's safe harbor and substantive claims*

Barclay makes two closely related claims concerning the substance of the Water Board's findings and order and the trial court's affirmance of the Water Board's actions: its actions at the Site are protected by the safe harbor of Water Code section 13304, subdivision (j) (subdivision (j); and it did not engage in affirmative acts with knowledge of the hazards involved.

With respect to the latter, Barclay argues there is "undisputed evidence that no one in the environmental, public

69

health, or legal community considered oil to be a hazardous or toxic substance in the 1960s," citing the declaration of its expert witness, Marcia Williams (Williams); Barclay also argues it "took no affirmative steps directed toward the discharge," and asserts there was "no evidence that Barclay knowingly moved or impacted any waste."

These claims present both factual and legal issues for analysis; issues we review applying the standards of review discussed above.

## A.     The factual claims

We are confronted at the outset of our consideration of Barclay's factual claims with the absence from Barclay's opening brief of a fair statement of the facts in the record.  Among the omissions are the following:  Barclay does not include in its opening brief facts, documented in correspondence between it and Shell, that Barclay visited the Site on October 21, 1965, at which time it necessarily observed what could be seen at the Site. During that visit it asked for specific information regarding the reservoirs, the approximate contents of each and other details about the Site; Shell provided this information to Barclay four days later.

These facts establish that Barclay was aware in the fall of 1965 of the presence of "liquid waste and petroleum residues" at the Site, based on its own inspection of the Site and the details contained in Shell's October 25, 1965 letter to it.  Barclay confirmed its knowledge of the presence of petroleum waste at the Site in its December 1, 1965 letter to Shell seeking permission to begin work on the Site.

Barclay also does not acknowledge facts in the record that are contrary to its presentation in the factual section of its

opening brief of the extent to which the petroleum residue and other waste were removed from—and remained and were buried at—the Site. And it has omitted from its appellant's statement of facts in its opening brief a fair summary of the communications to it from PSE, the engineering firm which Barclay had hired to advise it concerning development of the Site, including writings informing Barclay of the methods that would be used to both remove and bury concrete structures and soil containing petroleum residue and waste.[48]

As an appellant challenging the sufficiency of the evidence to support the judgment, it was Barclay's obligation to cite the evidence in the record supporting the judgment and, after doing so, explain why in the appellant's view such evidence is insufficient as a matter of law to support the findings made. Unless it does so, such a contention is deemed to have been waived. (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 749; *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; *Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80.) This rule rests on the premise that if an appellant fails to present the appellate court with all the relevant evidence, the appellant cannot carry its burden of demonstrating the evidence was insufficient to support the agency's decision because support for that decision may be present in the evidence which appellant omits. (*State Water Resources Control Bd. Cases,* at p. 750.)

_____

[48] Barclay includes in the "Factual Background" section of its opening brief the statement: "It is undisputed that Shell did not disclose to Barclay, and Barclay did not know, that Shell's reservoirs had leaked." The statement suggests a lack of knowledge by Barclay of the actual conditions at the Site, which is not consistent with the documentary record.

71

The examples mentioned above illustrate Barclay's failure to meet this appellant's obligation.

Setting aside this fundamental defect (which is sufficient to deny Barclay's factual contentions), we address Barclay's contention that the trial court erred in rejecting Barclay's claims that it "had no knowledge of any hazards" that might result from burying the concrete structures; that it "took no active, affirmative steps directed toward the discharge," and that there was "no evidence that Barclay knowingly moved or impacted [*sic*] any waste."

Barclay relies for support for its factual claims on testimony of four "surviving eyewitnesses," among others.[49]

___

[49] Barclay also relies on testimony of three expert witnesses retained by it, Jeffrey Dagdigian, Williams and Donald Shepardson. Dagdigian, a nonpercipient expert witness, provided a report (over 180 pages in length) in which he opined as to Barclay's "explicit knowledge" and as to what petroleum residue was removed from the Site and what remained. Among his findings were the following: "Barclay did not observe, grade or spread contaminated soil"; there was "no evidence that berm soils were impacted with petroleum hydrocarbons when Barclay used berm soil to fill the reservoirs"; and the hydrocarbon pollution on Site was the result of "upward migration" rather than due to any activities of Barclay.

The Water Board considered and rightly rejected these opinions and conclusions as there is substantial evidence, as indicated in the text earlier in this opinion, that supports both the Water Board's discounting of these opinions and its contrary factual findings, as well as the trial court's determination to rely instead, inter alia, on the firsthand account of Bach, who was on the Site during grading and Site preparation, instead of a person who was not a percipient witness and who failed to acknowledge the substantial contrary evidence in the record.

72

However, there is contrary evidence, which is substantial. This evidence, presented in greater detail earlier in this opinion, includes that the soil in several areas of the Site was oily, that in some locations one could smell the petroleum residue, as well as testimony from Bach, an engineer Barclay had retained and who was closely involved with work at the Site, regarding breaking up and burying the concrete floors of the reservoirs (that had literally contained petroleum and its residue for more than 40 years), as well as evidence that only some of the material containing petroleum residue and waste had been removed from the Site, and that much of the soil at the Site which did contain petroleum residue and waste was mixed with soil from outside the Site and then graded to make the housing pads in the new

---

Williams indicates in her declaration that she first worked for the United States Environmental Protection Agency in 1970 as one of its "charter employees." There is nothing in her declaration to indicate she had any firsthand knowledge of environmental issues prior to that year; nevertheless, she opines on the state of the law in California and on attitudes toward petroleum discharges in the 1960s. Many of her opinions are legal in nature; such opinions are the province of the trial court, which in this case clearly disagreed with the legal opinions which Williams offered, as evidenced by the absence of any reference to Williams's opinions in the trial court's order.

Shepardson provided his opinion on whether PSE's grading of the Site was "compliant with the Standard of Practice and Standard of Care" at the time. While Shepardson may be qualified to render such an opinion, his opinion is not relevant to the issues presented in this case; no one appears to dispute that the civil engineering aspects of developing the Site—e.g., grading and soil compaction—were properly done.

Carousel housing development.[50]  Further, test borings were made confirming that petroleum waste was buried at various depths at multiple locations on the Site.  The Water Board also considered, and rejected, the opinion of Barclay's expert who had opined that the petroleum residue and waste were the result of upward migration.

The RCAO discusses the factual bases for the Water Board's determination that Barclay discharged waste as defined in Water Code section 13050, subdivision (d) and that it is a responsible party.  The Water Board's findings in the RCAO include that Barclay "purchased the Site with explicit knowledge of the presence of petroleum reservoirs and the presence of residual petroleum hydrocarbons, and conducted various activities, including partially dismantling the concrete in the reservoirs and grading the onsite materials," and that these

---

[50]  Barclay's claim that all of the petroleum residue had been cleaned from the concrete before it was broken up is contrary to other evidence, which the Water Board found to be accurate (and the trial court affirmed) that at least with respect to the floor of one of the reservoirs, there was petroleum residue remaining which was mixed with soil and buried—after thousands of gallons of water were used to wash it, with the water percolating into the ground beneath.

Barclay's objection to the trial court's reliance on Bach's unsworn statement ignores that the rules of evidence are relaxed in administrative proceedings and that the Water Board applies California Code of Regulations, title 23, section 648.5.1, which expressly makes hearsay evidence admissible in accordance with Government Code section 11513.  The trial court made an express determination of the reliability of the contents of the unsworn statement that Bach had given, which we find to be persuasive.

activities "spread the waste at the Site, and contributed to the migration of the waste through the soil and groundwater."

In considering Barclay's challenges to the decision below, we have independently reviewed the record and determine that Barclay's factual contentions are without merit as there is substantial evidence to support the findings of its affirmative acts in spreading and burying the petroleum residue and waste, and thus to support the judgment below. (See *Yakov, supra*, 3 Cal.3d at p. 429 [the question on appeal is whether there is substantial evidence—contradicted or not—to support the judgment].)

**B.    The requirement of knowledge and Barclay's status as a discharger**

Barclay claims it had "no connection to the discharge" of waste, that its conduct at the Site was only "remote and passive" and that it had no knowledge of any hazards involved in its activities at the Site. We have established above that it was fully aware of the presence of petroleum residue and waste at the Site and that it was actively engaged through its agents in breaking up and burying the concrete and soil that contained the petroleum residue and waste.

We now address its claim that it did not know at the time that burying waste could have adverse environmental effects or adverse legal consequences. (We further address this issue in our discussion below of subdivision (j).)

As authority for its claim, Barclay relies on *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 (*Modesto*).[51] The holding of *Modesto* relevant to the present

---

[51]    Barclay also relies on a federal case, *Redevelopment Agency v. BNSF Ry.* (9th Cir. 2011) 643 F.3d 668. There, the court determined that the actions of BNSF were passive rather than

case was carefully explained in *TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291 (*TWC*):

"The issue in *Modesto* was whether the defendants, none of whom were landowners, were 'responsible parties' under Water Code section 13304, subdivision (a). (*Modesto, supra,* 119 Cal.App.4th at p. 35.) Water Code section 13304, subdivision (a) provides that a person is responsible for cleanup and abatement if the person 'causes or permits' a discharge that 'creates, or threatens to create, a condition of pollution or nuisance.' (Wat. Code, § 13304, subd. (a); see *Modesto,* at p. 35.) In *Modesto,* the First District Court of Appeal's interpretation of this statutory language was guided by its prior decision in *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605 (*Leslie Salt*).

"In *Leslie Salt,* the court construed a statute which allowed a cease and desist order to be issued to any person who had '"undertaken" ' to ' "place[] fill" ' without the requisite permit. (*Leslie Salt, supra,* 153 Cal.App.3d at p. 612.) In *Leslie Salt,* the plaintiff, who was the landowner, focused on the word ' "undertaken" ' and contended that the statute did not apply to anyone 'other than the one who actually placed the fill.' (*Leslie Salt,* at p. 612.) The First District held in *Leslie Salt* that the statute applied to 'landowners regardless whether they actually placed the fill or know its origin.' (*Leslie Salt,* at p. 617.) '[L]iability and the duty to take affirmative action flow not from the landowner's active responsibility for a condition of his land that causes widespread harm to others or his knowledge of or

active, distinguishing that case from the present one. Nor are we bound by decisions of federal courts other than those of the United States Supreme Court.

76

intent to cause such harm but rather, [but] quite simply, from his very possession and control of the land in question.' (*Leslie Salt,* at p. 622.)

"In *Modesto,* the First District's analysis focused on whether the defendants could be held liable for creation of a 'nuisance' within the meaning of the statutory language. (*Modesto, supra,* 119 Cal.App.4th at p. 37.) The First District rejected the defendants' contention that 'only those who are physically engaged in a discharge or have the ability to control waste disposal activities' can be held liable for the nuisance that discharge creates. (*Modesto,* at p. 41.) The First District held that those of the nonlandowner defendants 'who took affirmative steps directed toward the improper discharge . . . may be liable under that statute, but those who merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal' could not be held liable under the statute. (*Modesto,* at p. 43.)

"We can find nothing in *Modesto* that supports TWC's claim that a *landowner* cannot be held liable for a discharge unless it took an 'active role' in the creation of the discharge. *Modesto* itself did not involve the issue of a landowner's liability, and *Leslie Salt,* upon which *Modesto* was based, explicitly held that a landowner could be held liable based solely on the landowner's possession and control of the land.

"Here, there was substantial evidence that TWC 'cause[d] or permit[ted]' the discharge to occur by engaging contractors to perform the demolition activity that resulted in the discharge. Although TWC contends that it could not be liable because it did not 'actively participate in the demolition activities' or 'fail[] to take reasonable care,' Water Code section 13350, subdivision (b)

77

plainly provides that any person who 'causes or permits' a discharge is 'strictly liable' 'without regard to intent or negligence.' " (*TWC, supra,* 185 Cal.App.4th 29 at pp. 297-298.)[52]

The facts in the present case are even more compelling than those in *Modesto* and *TWC*: Here, there is substantial evidence that Barclay, through its agents, was aware of the presence on the Site of petroleum residue and its odors, and waste, and that Barclay took multiple affirmative steps over more than eight months to break up and bury the cement floors of the three reservoirs located on the Site, followed by grading the Site utilizing soil from the several berms surrounding the reservoirs as well as the perimeter berms on the property, together with soil brought to the Site from elsewhere. Barclay did this with knowledge of the more than 40-year history of the use of the Site as a petroleum tank farm as well as with data Shell had supplied to it and from its own inspection of the Site. That Barclay's conduct constituted "active involvement "in this work is conclusively established by the evidence.[53] Thus, it was

---

[52] The Water Board also found that Barclay did not qualify for the safe harbor of subdivision (j).

[53] In the RCAO the Water Board found that: "Lomita purchased the Site with explicit knowledge of the presence of the petroleum reservoirs and the presence of residual petroleum hydrocarbons, and conducted various activities, including partially dismantling the concrete in the reservoirs and grading the onsite materials. These actives spread the waste at the Site, and contributed to the migration of the waste through the soil and groundwater. The residual hydrocarbons are still present at the Site and continue to cause pollution and nuisance."

It also found that "The concentration of waste constituents in soil and groundwater exceed water quality objectives contained

actively engaged with knowledge of the condition of the property in the "discharges" of petroleum residue and waste into the soil on the Site, resulting in pollution and creation of a nuisance.

Barclay argues, however, that it could not have known at the time it buried the soil and concrete containing the petroleum residue and waste that its conduct was in violation of any laws then in effect. There are two aspects to this claim: (1) that it must have known at the time of the environmental consequences of its actions and (2) that it must have known then that its conduct was unlawful under laws then in force.

Neither is correct. Barclay's argument assumes it must have had a specific intent to cause pollution or nuisance, yet it cites no authority to support any such requirement. Since at least our Supreme Court's holding in *In re Marley* (1946) 29 Cal.2d 525, " 'guilty knowledge and intent' " have not been elements of proof required to establish liability for violation of regulatory offenses. (*Id.* at p. 529; see *People v. Chevron Chemical Co.* (1983) 143 Cal. App.3d 50, 53.)

Moreover, Barclay's argument that its conduct was not considered at the time to be unlawful fails to take into account

_____

in the Water Quality Control Plan for the Los Angeles Region (Basin Plan) including state-promulgated maximum contaminant levels."

The RCAO contains an extensive description of the waste uncovered at the Site beginning in 2007, including findings of petroleum hydrocarbons, benzene, ethyl benzene, methane, toluene, arsenic, lead, and chlorinated solvents in soil and soil vapor and in groundwater. The methane was identified in concentrations posing a potential safety hazard; other chemicals were determined to significantly exceed the lower level explosive limit, also posing a potential safety hazard.

79

that it is Barclay's burden to establish that its activities at the Site in the 1960s meet the requirements for the safe harbor exception of subdivision (j).  The cases we discuss in the next section establish that Barclay's interrelated claims that it could not have known in the 1960s that its actions were likely to result in pollution of the groundwater at the Site and were contrary to law are not well-founded.

### C.    The subdivision (j) safe harbor

1.  <u>Introduction</u>.

Barclay's legal contention—that its actions in grading and developing the Site did not violate laws in existence at the time, and thus its conduct is protected by the "safe harbor" of subdivision (j)—lacks merit.

The safe harbor set out in subdivision (j) provides:  "This section does not impose any new liability for acts occurring before January 1, 1981, if the acts were not in violation of existing laws or regulations at the time they occurred."

At the same time subdivision (j) was added to Water Code section 13304,[54] the Legislature amended subdivision (a) of that section to hold past producers, transporters, or disposers of hazardous waste liable for corrective action under the Water Code.  (Enrolled Bill Rep. on Assem. Bill No. 2700 (1979-1980 Reg. Sess.) July 17, 1980.)[55]  The Enrolled Bill Report for

---

[54]    The provision that is now subdivision (j) of section 13304 was added to section 13304 in 1980 as subdivision (f) of the same section.  (Stats. 1980, ch. 808, § 3, pp. 2538-2540.)

[55]    Enrolled bill reports may properly be considered as evidence of legislative intent.  (*Conservatorship of Whitley v. Maldonado* (2010) 50 Cal.4th 1206, 1218, fn. 3; *Elsner v. Uveges, supra,* 34 Cal.4th at p. 934, fn. 19.)

Assembly Bill No. 2700 explains that one of the specific purposes of this legislation was to "permit the [water boards] to take action against persons whose past actions . . . would pollute the state's waters or create a nuisance."  The bill also "clarifies the authority of the Board to act when discharges have ceased by the time of discovery."  Subdivision (j) was added so that the revised subdivision (a) "would not . . . impose a sanction on persons whose activities were legal at the time they occurred."  (Assembly Ways & Means Com. analysis of Assem. Bill No. 2700 (1979-1980 Reg. Sess.) as amended Apr. 15, 1980, com. 2.)  The addition of subdivision (j) clarified that the expansion of the authority of the regional and state water boards in other provisions of the 1981 legislation did not bar a discharger from liability under other laws—even if the damage from the discharge occurred years after the discharge—so long as the conduct resulting in the pollution or nuisance was not legal when it occurred prior to 1981.

To qualify for the safe harbor of subdivision (j), the burden was and is on Barclay to establish that its conduct was legal at the time it conducted its activities at the Site; that those activities did not violate any law or regulation in force at that time.[56]

There are two reasons Barclay bears this burden.  First, the reasoning of the court of appeal in *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, which so held with respect to the virtually identical provision of Health and Safety Code section 25366, subdivision (a), compels a similar result in this case.  (*Sabic,* at p. 389.)  Second, it is a " 'longstanding' legal principle" that when a statute carves out an

---

[56]    The requirement of subdivision (j) that the conduct occur prior to January 1, 1981, is clearly met in this case.

exception to its application, the burden of proving application of the exception is on the party seeking its protection in the particular case. (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 23.)

The parties all interpret the phrase "existing laws or regulations" in subdivision (j) to include laws and regulations without limitation to those enacted as part of, or based on authority granted by, the Water Code. We agree with this reading of subdivision (j); this is its plain meaning, a conclusion we confirmed by our review of the legislative history of enactment of this statue in which we found no suggestion that subdivision (j) was to be narrowly focused, e.g., solely on provisions of the Water Code. Additionally, the more narrow construction would render the safe harbor virtually without purpose. (See *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334, 351 [statutes applicable to the allegations of discharge of hazardous substances and pollution (there, Health & Saf. Code, § 25363) are not the exclusive remedy and do not preclude claims the same conduct violated other laws (there, the common law)].)

We turn to consider Barclay's arguments that the trial court erred in its determinations that its actions were in violation of other laws, i.e., of provisions of the Health and Safety Code, a Los Angeles County Ordinance, the Civil Code, and the Fish and Game Code, each of which was in force at the time of Barclay's activities at the Site.[57]

---

[57] Barclay errs in arguing the subdivision (j) safe harbor applies to sanitize its conduct because " '[n]uisance' is already *an element of discharger liability* under section 13304 [subdivision (a)]." This argument is inconsistent with Barclay's argument that what is relevant is the law in effect at the time it developed

82

2. Health and Safety Code section 5411.

In 1949, the Legislature enacted Health and Safety Code statutes granting authority to the State Department of Health (Health Department) to act when it determined there was or may be contamination as that term was defined in that new statutory plan. (Stats. 1949, ch. 1550.) This legislation also required the Health Department to refer for action to the regional water pollution boards (created in the same year by the Dickey Act) evidence of actual or potential pollution and evidence of nuisance.[58] (Stats. 1949, ch. 1549, § 2, p. 2790 [former § 5413].)

As enacted in 1949, Health and Safety Code section 5411 provided: "No person shall discharge sewage or industrial waste,

---

the Site: Section 13304, subdivision (a) did not exist at the time Barclay engaged in the conduct at issue; the statute was not enacted until 1969 as part of the Porter-Cologne Act, and was not in effect until January 1, 1970, after Barclay's activities at the Site had concluded. (Stats. 1969, ch. 482, § 18, p. 1066.) Thus, subdivision (a) does not meet the subdivision (j) requirement that it be in force *at the time of Barclay's conduct.*

Even if Water Code section 13304 applied, its subdivision (a) proscribes both pollution and nuisance; Barclay's activities constituted both.

[58] That the two statutory plans were closely coordinated is confirmed by their overlapping definitions and interrelated provisions, as well as by the circumstance that they were enacted as chapters 1549 (Dickey Act) and 1550 (Health & Safety Code sections) of Statutes 1949. Also, section 2 of Statutes 1949, chapter 1550 provided, "This act becomes operative only if Assembly Bill No. 2156 introduced in the 1949 Regular Session is enacted by the Legislature at its 1949 Regular Session." The referenced bill was what became the Dickey Act.

or the effluent of treated sewage or industrial waste, in any manner which will result in contamination, pollution or a nuisance." (Stats. 1949, ch. 1550, § 2, p. 2790.)[59]

Former Health and Safety Code section 5410, enacted at the same time, defined the terms "sewage," "industrial waste," "waters of the state," "pollution," and "nuisance" in language identical to that enacted that year in the Dickey Act.[60] (Compare

---

[59] The only change made in this statute between its enactment in 1949 and the present was to substitute the term "other waste" for the term "industrial waste" in 1967. (Stats. 1967, ch. 1447, § 2, p. 3373.)

[60] "Pollution" was defined as: "an impairment of the quality of the waters of the State by sewage or industrial waste to a degree which does not create an actual hazard to the public health but which does adversely and unreasonably affect such waters for domestic . . . or other beneficial use." (Stats. 1949, ch. 1550, § 2, p. 2790 [former § 5410, subd. (f)].)

"Nuisance" was defined as "damage to any community by odors or unsightliness resulting from unreasonable practices in the disposal of sewage or industrial wastes." (Stats. 1949, ch. 1550, § 2, p. 2790 [former § 5410, subd. (g)].)

"Industrial waste" was defined as "any and all liquid or solid waste substance, not sewage, from any producing, manufacturing or processing operation of whatever nature." (Stats. 1949, ch. 1550, § 2, p. 2790 [former § 5410, subd. (b)].)

"Waters of the State" was defined as "any waters, surface or underground . . . within the boundaries of the State." (Stats. 1949, ch. 1550, § 2, p. 2790 [former § 5410, subd. (d)].)

"Contamination" was defined as "an impairment of the quality of the waters of the State by sewage or industrial waste to a degree which creates an actual hazard to the public health through poisoning or through the spread of disease. 'Contamination' shall include any equivalent effect resulting from

84

Stats. 1949, ch. 1549, § 1, pp. 2782-2783 [former Wat. Code, § 13005] with Stats. 1949, ch. 1550, § 2, p. 2790 [former Health & Saf. Code, § 5410].)

As noted above, actions to abate contamination were the responsibility of the Health Department, while actions to address pollution and nuisance were the responsibility of the regional and state water boards.  Thus, the Health and Safety Code legislation required that, "[w]henever the [Health Department] finds that a pollution or nuisances does, in fact, exist, such condition shall be immediately referred by the department to the proper regional board for action . . . ."  (Former Health & Saf. Code, § 5413; Stats. 1949, ch. 1550, § 2, p. 2790 [former §§ 5412, 5413].)

Barclay's argument that it did not violate Health and Safety Code section 5411 as it existed at the time of its activities on the Site depends on the answer to one of the following questions:  (1) Did Barclay create or assist in the pollution of the

---

the disposal of sewage or industrial waste, whether or not waters of the State are affected."  (Stats 1949, ch. 1550, § 2, p. 2790 [former § 5410, subd. (e)].)

The Dickey Act contained identical definitions of these terms.  (Stats. 1949, ch. 1549, § 1, pp. 2782-2783 [former § 13005].)

In 1967, the term "industrial waste" was replaced by the term "other waste" each place it appeared in the Health and Safety Code statutes, broadening the meaning of those terms. (Stats. 1967, ch. 1447, §§ 2 & 3, pp. 3373-3374.)

The similar terms in the Dickey Act were also amended in 1967 to effect the same changes.  (Stats. 1967, ch. 1447, § 6, pp. 3375-3376 [former § 13005].)  Two years later, the Dickey Act was replaced by the Porter-Cologne Act; however, as the new law did not become effective until January 1, 1970, we do not address its terms in any detail.  (See Stats. 1969, ch. 482, § 34, p. 1088.)

Site by "impairment of the quality of the waters of the state by . . . other waste to a degree which . . . does adversely and unreasonably affect [waters of the state] for domestic . . . or other beneficial use"; or (2) Did Barclay create or assist in the creation of a nuisance, that is, were the practices Barclay employed in burying the petroleum residue and waste on the Site "unreasonable . . . in the disposal of . . . other wastes." (See former Health & Saf. Code, § 5410, subds. (f), (g).)

In support of its argument that its actions did not adversely and unreasonably affect waters of the state, Barclay relies on two cases, *Thompson v. Kraft Cheese Co.* (1930) 210 Cal. 171 (*Kraft Cheese)* and *People v. City of Los Angles* (1948) 83 Cal.App.2d 627 (*City of L.A.*). Neither case supports Barclay's claims; instead, they indicate that Barclay did act unreasonably in burying the petroleum residue and in doing so violated Health and Safety Code section 5411.

In *Kraft Cheese*, our Supreme Court upheld a modified injunction against the discharge of byproducts of cheese manufacturing which Kraft was allowing to seep into the ground and into a creek adjacent to its plant. Barclay describes the offense supporting issuance of the injunction in *Kraft Cheese* as "enforcing section 5411 against cheese factory for discharge of dirty water that came from floor cleaning."[61]

---

[61] The statute applied in *Kraft Cheese*, a predecessor of Health and Safety Code section 5411, forbad the discharge of "any . . . substance, offensive, injurious or dangerous to health, into any . . . waters used or intended to be used for human or animal consumption or for domestic purposes . . . without a permit . . . ." (Stats. 1907, ch. 492, § 2, p. 894; Deering's General

More was involved than just "dirty water":  The effluent from the manufacturing process of cheese itself was held to be a discharge sufficient to sustain the injunction in that case.  (*Kraft Cheese, supra,* 210 Cal. at pp. 176-177.)

Barclay's actions in the present case are of no lesser consequence and impact:  The discharge in the present case was clearly waste within the terms of Health and Safety Code sections 5410 and 5411,[62] and Barclay's conduct did clearly constitute the "discharge of sewage or other waste, or the effluent of treated sewage or other waste, in a[] manner which [resulted] in contamination, pollution or nuisance."  Thus, the holding in *Kraft Cheese* actually supports the conclusion that Barclay's actions in the 1960s were contrary to Health and Safety Code section 5411, and, thus, not within the subdivision (j) safe harbor. To accept Barclay's argument would require that we determine that petroleum residue and waste are less deleterious than the leftovers from the manufacture of an edible foodstuff.

*City of L.A., supra,* 83 Cal.App.2d 627, also does not support Barclay's claim that the discharge of petroleum waste was not a potential subject of concern or subject to enforcement action in the late 1960s.[63]  In *City of L.A.*, the Attorney General

---

Laws (1923 ed.) Act 6238, § 2, quoted in *Kraft Cheese, supra,* 210 Cal. at p. 177.)

[62]    As we have explained in the text above, the legislative changes to these statutes in 1967 do not affect our conclusions.

[63]    *City of L.A.* was decided prior to enactment of the Dickey Act.  Even at the time of its decision—as was the case after the effective date of the Dickey Act—conduct such as that at issue in

sued several cities on behalf of the state to restrain those cities from, among other things, violating State Board of Health rules against creating a public nuisance based on their failure to comply with permit requirements for operation of a sewage treatment works.  Among the court's holdings was that, even though certain of the municipality defendants did not themselves maintain the sewage treatment plant, they could be held legally responsible for maintaining a public nuisance to the extent they contributed to it by allowing their sewage to be discharged into the ocean through the plant owned and operated by the City of Los Angeles.  (*Id*. at p. 643.)

That case did not directly consider whether the discharge of petroleum residue was a violation of Health and Safety Code section 5411.  Thus, as the Water Board points out, the case is

the present case was considered actionable as a public nuisance which could be abated.

The *City of L.A.* court makes the additional point that negligence is not an element of an action to abate a public nuisance, holding that the conduct at issue in that case constituted a per se "violation of the rights of the people of the State of California, which amounts in law to a nuisance, regardless of whether or not it is due to any negligent act or omission."  (*City of L.A., supra*, 83 Cal.App.2d at p. 643; cf. *In re Marley, supra,* 29 Cal.2d at p. 529.)

Thus, based on the holding in *City of L.A.*, Barclay's conduct would be a per se nuisance, rendering meritless Barclay's argument that it must have known that its activities would or might cause harm.  (Cf. *People v. Chevron Chemical Co.*, *supra*, 143 Cal. App.3d at pp. 52-53 [in construing Fish & G. Code, § 5650 (which is not strictly applicable in the present case as that code focuses on waters that do or might support aquatic life) the court held that regulatory offenses do not require proof of mens rea; instead they are strict liability offenses].)

not directly applicable. (*Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 730 [an opinion is not authority for a proposition it does not consider]; *Hart v. Burnett* (1860) 15 Cal. 530, 598-600 [same]; *Contra Costa Water Dist. v. Bar-C Properties* (1992) 5 Cal.App.4th 652, 660 [same].)

*City of L.A.* did conclude, however, that aiders and abettors in the discharge of sewage could be held liable for nuisance. Thus, rather than provide support for Barclay's claim of no liability, the case can be read to indicate Barclay could be held liable as an aider and abettor in the discharge of petroleum residue originally deposited on the surface of the Site by Shell.

Based on the facts and circumstances discussed above, we conclude that Barclay has not carried its burden to establish that its conduct was within the subdivision (j) safe harbor and that the trial court erred in its determination that Barclay's conduct did not qualify for safe harbor protection. Indeed, there is no credible evidentiary dispute: Barclay's actions constituted the discharge of "other waste" which "will result in . . . pollution or a nuisance" in violation of former Health & Safety Code section 5411, and did not qualify under the subdivision (j) safe harbor.

Further, pursuant to *City of L.A.,* Barclay's claim it did not know what it was doing in burying the petroleum residue and waste on the Site could cause harm is not relevant to the finding of a violation of Health and Safety Code section 5411. (*City of L.A., supra*, 83 Cal.App.2d at p. 644, citing *Kafka v. Bozio* (1923) 191 Cal. 746, 748.)[64]

---

[64]   Contrary to Barclay's claims that there was no precedent for determining that its conduct might be subject to sanction, we also note that as long ago as 1884, our Supreme Court held that mining debris, consisting of otherwise benign sand and rock,

3.     Other Bases for the Rulings Below.

The Water Board found that Barclay's activities also violated Fish and Game Code section 5650 and Los Angeles County Ordinance 20.36.010, determinations which Barclay disputes.

Because we have concluded that the safe harbor cannot apply to Barclay's actions in this case based on our holding that Barclay's actions were contrary to Health and Safety Code section 5411, we need not address other reasons for the Water Board's action in adding Barclay as a responsible party in the RCAO or for the trial court's affirmance of that order.  We do so based on the principle of appellate procedure that a judgment will be affirmed upon any one of the bases upon which the trial court made its determination.  (*Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1040.)

---

could constitute a public nuisance based on the quantity of its discharge if that discharge affected the rights of the community, in that case to navigation in the rivers into which the debris was allowed to flow.  (*People v. Gold Run Ditch & Mining Co.* (1884) 66 Cal. 138, 147.)  And, in 1933, our Supreme Court held that a nuisance had been created by the "escape over and about the entire neighborhood of fine dust, dust, particles of sand . . . creating a condition that makes it impossible for persons in the vicinity to properly ventilate their homes and impossible to use their yards for play spaces for their children . . . ." (*Eaton v. Klimm* (1933) 217 Cal. 362, 366.)  The Water Board's factual findings in this case indicate that the impact of Barclay's actions is far greater that the impact determined to be sufficient in these earlier cases.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**.


                                        GOODMAN, J.*

We concur:



EDMON, P.J.                    EGERTON, J.

---

*       Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.